UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| V. | ) | Case No. 21-cr-10243-GAO |
| | ) | |
| BARNDOL SUONG | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT SUONG'S MOTION TO SUPPRESS**

Defendant BARNDOL SUONG hereby files the within memorandum of law in

support of his motion to suppress any and all fruits of the search of his residence at 71

Corbett Street, Lowell, MA, on June 10, 2021 pursuant to a search warrant.

**FACTS**

**I.      SUONG'S CONNECTIONS TO 71 CORBETT STREET,
        LOWELL, MA**

In the within criminal case, Defendant BARNDOL SUONG (hereinafter "SUONG")

is charged with being a felon in possession of a firearm. The charge arises out of the

discovery of this gun, ammunition and other evidence, alleged drugs, during the execution of

a search warrant at his residence at 71 Corbett Street, Lowell, MA. (doc. 13-6, Affidavit of

Special Agent Matthew R. Zaremba, filed in 21-MJ-1393-DLC, pp. 3, 4)

As attachment A to the warrant shows, 71 Corbett Street is a single-family home.

(SUONG-000529-530)

Before FBI agents made entry into his home, SUONG was called from the premises

to depart therefrom so that the search warrant could be executed. (doc. 13-3, p. 5) SUONG

complied with the order and was detained while the residence was safely cleared of persons.

1

(doc. 13-3, p. 5) The search involved a search of a bedroom that agents believed to be SUONG's bedroom where, in a dresser near the bed, agents located an unloaded Taurus revolver and in the same drawer five rounds of ammunition stored in a rubber glove. (doc. 13-3, p. 5) Located in a box on a night stand next to the dresser were SUONG's driver's license and social security cards for him and his family. (doc. 13-3, pp. 5-6) Additional rounds of ammunition that appeared to be similar to the earlier-mentioned five rounds were recovered from the bottom left dresser drawer.  (doc. 13-3, p. 7) SUONG was arrested at his residence. (doc. 13-3, p. 8) SUONG has lived in his home with his three children, their mother and his parents for several years. (**AFFIDAVIT OF DEFENDANT BARNDOL SUONG IN SUPPORT OF DEFENDANT BARNDOL SUONG'S MOTION TO SUPPRESS, p. 1, ¶ 3** hereinafter "SUONG Affidavit")

## II.     Application for Search Warrant and Supporting Affidavit

On June 9, 2021, DEA agent Matthew Zaremba applied to the United States District Court for the District of Massachusetts for a warrant to search 71 Corbett Street, Lowell, MA, ("TARGET PREMISES") (SUONG-000478-535) On June 9, 2021 at 3:45 pm, the Honorable United States Magistrate Judge Donald L. Cabell approved the application and issued a search warrant for the Target Premises for items described in Attachment B records, tangible objects, cash, computer hardware and software and mobile phones located therein and for evidence of drug trafficking and other materials (SUONG-000531-535)

### A.     FBI Agent Zaremba's Training and Experience

Zaremba has been a FBI Special Agent since 2006 presently assigned to the Boston Field Office, Lowell Resident Agency to work Counterterrorism and Criminal matters. (SUONG-000487). In his earlier employment at FBI Headquarters, he worked joint overseas

investigations related to threats against the United states, worked on a Combined Joint Interagency Task Force, served as an Assistant Legal Attache in South Africa and worked on the FBI's Joint Terrorism Task Force in Boston, MA. (SUONG-000487) He received specialized training regarding the activities of narcotic traffickers including their methods used to package, store and distribute narcotics and their methods to conceal and launder the proceeds of these activities. (SUONG-000487, ¶ 3). Agent Zaremba submitted the following boilerplate information: that he was familiar with the manner and means commonly employed by drug traffickers, including those employed to escape detection by law enforcement, that he was familiar with traffickers' terminology and slang and had observed several drugs and was aware of their on-the-street prices, their packaging and the street terms used in the trade, (SUONG-000488, ¶ 4); that he participated in controlled drug purchases, prepared affidavits in support of  applications for criminal complaints and arrests and/or search warrants, and has conducted electronic and physical surveillance of drug distributors (SUONG-000488, ¶ 5); that he is familiar with drug traffickers' methods of operation including distribution, storage, transportation of those substances and the collection of drug proceeds, how they use vehicles, common carriers, mail, delivery services and "stash" houses, and that he is familiar with their use of telephones, coded/slang conversations, text messages, paper messages and their street terms (SUONG- 000488-000489, ¶ 6).

**B. Zaremba's Recounting of "Facts," Beliefs and Speculations to seek to attain probable cause.**

Zaremba's Affidavit in support of an application for a warrant to search SUONG's home at 71 Corbett Street (hereinafter "Target Premises"), alleged "probable cause to believe

that the Target Premises contain[ed] evidence, fruits and instrumentalities of the crimes as described in Attachment B. (SUONG-000531)."

Zaremba's conclusion is indefensible because neither he, nor any other agents, nor any confidential informant, saw SUONG engage in any drug transaction at Target Premises, never saw SUONG engage in any drug transaction at any premises external to the Target Premises, never saw SUONG present at any drug transaction, never saw SUONG receive the proceeds of any drug transaction, never saw SUONG packaging drugs for distribution, and never saw SUONG leave from or return to the Target Premises with any container where agents could believe it or them to contain drugs or drug proceeds. (See entire Aff. (SUONG-000478 – 000538).  Neither Zaremba nor any other law enforcement agent heard either by electronic surveillance or any other method any words that SUONG allegedly stated to anyone, including his alleged co-conspirators that discuss a drug transaction or any package at the United States Post Office. (See entire Aff. (SUONG-000478 – 000538). Therefore, there is no reason to assume the applicability of the boilerplate to the TARGET PREMISES as Zaremba does, nor is it logical to do so.

Although Zaremba at ¶ 11 on SUONG - 000490 refers to controlled purchase of controlled substances, not a single described incident of such activity involves SUONG. (See entire Aff. (SUONG-000478 – 000538). Although Zaremba at ¶ 12 on SUONG - 000490 refers to "Sneak & Peek" search warrants, only one of the three such described searches arguably and allegedly involves SUONG, but cannot even be shown to involve the TARGET PREMISES.

In an attempt to support his application and to demonstrate probable cause, Zaremba gives some background to the FBI's investigation of the One Family Clique, founded and led

4

by Sarath YUT (hereinafter "YUT"). (SUONG- 000490 – 000491) Zaremba describes the members as engaged in drug and firearms trafficking, robbery and acts of violence against rival gang members. (SUONG- 000491) In ¶ 15, Zaremba describes YUT's activities, not SUONG's, but includes YUT's utilization of the USPS services to transport drugs and cash. (SUONG- 000491) Nowhere does Zaremba assert a single action of SUONG as a gang member engaging in the above-described activities.  (See entire Aff. (SUONG-000478 – 000538).

     Zaremba then in ¶¶ 16 – 19 describes a detailed undercover drug buy of February 24, 2020, the event having occurred more than 15 months before the date the warrant was granted (SUONG- 000491-000493, 000537) The FBI undercover employee made a controlled purchase of cocaine from PIN (hereinafter "PIN"), who is not demonstrated throughout Zaremba's affidavit to have any connection with SUONG. (SUONG- 000487-000535) The agents not only have physical surveillance on PIN from YUT's and PROEUNG's stash house at 17 Walker Street but also through electronic surveillance monitored PIN's car from his home to the stash house where PIN conducted the transaction. On February 25, 2020, a pole camera monitored KEO's (hereinafter "KEO") obtaining a mailed package, a large brown box from a USPS mail van which he brought inside a residence at 1 Bartlett Court;  KEO later brought out of  the residence a similar box which he placed inside a black Silverado that YUT, carrying with him a large brown package, later exited and brought into 17 Walker Street to which location PIN, bringing with him a white envelope similar to the one in which he had received cash from a controlled buy, later came. Zaremba's affidavit describes nothing about this February 24, 2020 transaction so as to

involve in any way SUONG or SUONG's residence at 71 Corbett Street. (See entire Aff. (SUONG-000478 – 000538).

Zaremba then in ¶¶ 20 -22 describes a "Sneak and Peek Search Warrant" of March 2, 2020, this activity being 14 months before the date the warrant was granted. (SUONG-000493-000494, 000537). Zaremba's affidavit describes nothing about this March 2, 2020 transaction so as to involve in any way SUONG or SUONG's residence at 71 Corbett Street. (See entire Aff. (SUONG-000478 – 000538). This transaction involves YUT mailing at the USPS office in Billerica, MA a package addressed to a Justin Lane in Del Mar, CA with a return address of Christian Seng in Billerica, MA. USPS intercepted the package and a search warrant, upon execution, disclosed $54,000, some bills bearing the same serial numbers matching official government funds given in the purchase to PIN on February 24, 2020.  In ¶ 22, Zaremba discusses that investigators estimate that YUT mailed from January, 2020 to August 2020 at least $594,00 in bulk cash to Del Mar, CA and identified 35 additional parcels mailed by YUT from MA or NH to CA, without identifying any specific time period, and estimate without any corroboration that those parcels contained 1.75 million dollars in bulk cash. (SUONG – 000494) None of them are alleged to have involved SUONG or 71 Central Street. (See entire Aff. (SUONG-000478 – 000538)

Zaremba in ¶¶ 23 - 41 then describes in depth the "Suspected Drug Proceeds Parcel – November 3, 2020, an event older than 7 months from the date the warrant was granted. (SUONG- 000494-000502, 000537). In this event, YUT, surveilled by pole camera, leaves 105 Tanner Street, a "known drug processing and distribution location" (f.n. 11 at SUONG-000494) with two large brown boxes that he mailed from North Billerica's USPS to Justin Lane, Del Mar CA. (SUONG- 000494 - 000495) The sender's name was C. Pyne at 58

Corbett Street, Lowell MA. Both were actual addresses but no individuals, Lane or Pyne could be identified as associated with their respective addresses. (SUONG- 000495) One parcel was 53523. (SUONG- 000495) Because the address to which parcel 53523 (hereinafter "parcel) was a vacant lot, it could not be delivered and was returned to the post office; this data was learned on November 6, 2021. (SUONG- 000496) From November 6, 2020 through November 12, 2020, while IP addresses were tracking parcel 53523, no one made inquiry of the USPS about the parcel which on November 12, 2020 was scanned as "Return to Sender" and sent to Boston USPS, arriving on November 13, 2020. (SUONG- 000496)

On November 16, 2020, USPS attempted delivery of the parcel to 58 Corbett Street, Lowell, but the parcel was not left with the unidentified female at that address and was returned to USPS Billerica, because the female said that C. Pyne did not live at that address and the carrier told her that the parcel would be held at DDU and could be picked up with proper identification. (SUONG- 000496). At about 12:50 pm, a man identifying himself as YUT stated that he went to the Lowell post office to inquire about the parcel and was directed to call Billerica DDU. (SUONG- 000497). After the supervisor told him to bring identification to pick up the parcel, the caller explained that his friend who lives at 71 Corbett Street, (SUONG's address) mistakenly listed the incorrect return address of 58 Corbett Street and that he, the caller, lived at 58 Midland Street, Lowell. (SUONG- 000497). The caller responded to the supervisor's question about the listed sender of C. Pyne by falsely stating that C. Pyne was the friend who mailed the package, an untruth confirmed by video footage showing YUT to have mailed the package. (SUONG- 000497).  The caller stated that he would bring a friend to corroborate his story.  (SUONG- 000497).

At approximately 1:50 pm., a male identifying himself as YUT called Billerica DDU and relayed the same story but this time stated the sender name of C. Pyne was a company acronym. The caller requested that the parcel be sent to the Lowell post office and the manager reminded the caller to present proper identification. (SUONG- 000498). At 4:30 p.m., the parcel was placed in the FBI temporary evidence vault. (SUONG- 000498).

The next day, November 17, 2020, agents transported the parcel to the Lowell post office where it was there secured in the Post Master's office. (SUONG- 000498).

On November 18, 2020, when an unknown male called the Lowell post office about the parcel, he was told that the parcel had not yet arrived but would be there shortly. (SUONG- 000498). At 4:50pm, a male and female arrived at Billerica DDU and inquired about the parcel and after seeing YUT's identification were advised by the facility supervisor that the parcel was sent as requested to the Lowell post office where YUT stated he would get it the next day. (SUONG- 000498).

On November 19, 2020, identified by their identifications, YUT and SAVOEURN CHOUN, (hereinafter "CHOUN") SUONG's significant other and mother of SUONG'S children, of 71 Corbett Street, Lowell, appeared at the Lowell post office and at about 5:00 pm, each signed separate receipts and the supervisor gave the parcel to YUT. (SUONG – 000499) YUT gave a similar story to the supervisor about the incorrect return address but stated that C. PYNE was a member of his "car crew." (SUONG – 000499) Zaremba **believes** that all of the various versions of the story YUT told are false.  (SUONG – 000499)

On November 20, 2020, agents confirmed YUT and CHOUN picked up the parcel. (SUONG – 000499) Zaremba **believes** that the parcel contains drug proceeds because YUT

8

tracked the parcel carefully, and because he used a false story to retrieve the package. (SUONG – 000499)

Zaremba then addresses the use of a cellular telephone (978) 995-8091 in furtherance of the scheme to retrieve the parcel. (SUONG – 000499- 000502) First, Zaremba identifies YUT's phone 3292. (SUONG – 000499) Zaremba **attributes** (978) 995-8091 (hereinafter "8091") to SUONG but does not, unlike as to YUT's phone, state that SUONG is its user; he notes that these two phones, on November 5, 2020, exchanged nine text messages, and on November 7, 2020 exchanged thirteen text messages, and on November 8, 2020 exchanged eight text messages but Zaremba fails to recite the contents of any of the text messages within the affidavit.  (SUONG – 000500) (See entire Aff. (SUONG-000478 – 000538). He notes that these two phones exchanged a single 30 second phone call on November 6, 2021, and 2 phone calls totaling 6 minutes, 16 seconds in length but, as none of the conversations were electronically monitored, Zaremba cannot divulge, and does not divulge their contents anywhere in the affidavit. (SUONG – 000500) (See entire Aff. (SUONG-000478 – 000538).

Two of multiple IP addresses tracking the parcel identify 8091 twice tracking the parcel on November 9, 2021. Zaremba speculates in asserting his beliefs that from this tracking activity:

> I believe that SUONG was interested on YUT's behalf with what happened to the package and was likely attempting to aid YUT in its retrieval. I believe that, because SUONG actually lived at 71 Corbett Street, which – according to YUT's (false) story – was the address of the sender, to whom the parcel would be returned, YUT enlisted the assistance of SUONG with retrieving the package. I further believe that this pattern of phone activity is consistent with YUT and SUONG discussing what happened to the parcel, YUT providing SUONG with the tracking information and SUONG then tracking PARCEL 53523.

(SUONG – 000500 - 000501) Please note that the sender's address was listed as Corbett Street, but not **71**, as it was listed as **58**. Zaremba fails to recite any knowledge that SUONG has with regard to the contents of the parcel, how and when SUONG allegedly obtained that knowledge, and what YUT told SUONG, if anything, about the parcel, but without this knowledge, Zaremba's beliefs dissolve into speculation which does not rise to the level of probable cause. (SUONG – 000499 - 000503) (See entire Aff. (SUONG-000478 – 000538).

Zaremba notes that YUT's phone, 3292, began to track the parcel on November 9, 2021 and stopped the text tracking the parcel on the same day after he picked up the parcel. (SUONG – 000500) Zaremba **believes** that YUT tracked the parcel because it contained drug proceeds, but as the package was never opened, Zaremba's belief remains pure speculation, a hypothesis that does not rise to the level of probable cause. (SUONG – 000500)

On November 16, 2020 throughout the day, from 9:03 am to 2:08 pm, the two phones exchanged 20 text messages and 3 phone calls for 13 minutes 13 seconds. (SUONG – 000501- 000502) Nowhere are the contents of the text messages disclosed within the affidavit. (See entire Aff. (SUONG-000478 – 000538). Nowhere are the phone call's conversations' contents between the two phones disclosed within the affidavit. (See entire Aff. (SUONG-000478 – 000538). During the same time period, someone using YUT's phone 3292, (let us assume YUT) called Billerica USPS 6 times totaling 16 minutes, 45 seconds. From the uses of the two phones, Zaremba believes that these communications were about retrieving the parcel. (SUONG – 000501- 000502)

On November 18, 2020, YUT's phone for 57 seconds made contact with 978-995-2736, a number Zaremba attributes to SUONG. (SUONG – 000502) Although Zaremba believes that YUT knew the parcel was not delivered in CA and would eventually return to

58 Corbett Street, Zaremba nowhere states any facts in the affidavit to substantiate his belief

as to what YUT knew, which belief therefore emulsifies into speculation. (SUONG –

000502) (See entire Aff. (SUONG-000478 – 000538). He asserts that, because YUT provided

the return address of 71 Corbett Street to USPS as part of his story, YUT, SUONG and

CHOUN conspired to develop a story to explain the incorrect return address. (SUONG –

000502) Zaremba offers no facts to show any agreement between SUONG and YUT to

change his surmise from speculation to fact. (See entire Aff. (SUONG-000478 – 000538).

### What is omitted from the Affidavit as to this sole transaction

As to ¶¶3-6, *supra,* nowhere throughout his Affidavit does Agent Zaremba say that he

"also reviewed **recorded** conversations and telephone, financial, and drug records" relating

to 71 Corbett Street or of SUONG. (See entire Aff. (SUONG-000487 – 000538). Nowhere in

the Affidavit does Agent Zaremba say that he had knowledge of the contents of telephone

conversations or substance of any text messages or emails that occurred during SUONG's use

of any cellular telephones or other telephones at 71 Corbett Street or of any knowledge of the

possession or use of any cellular telephones or other telephones by any of that dwelling's

residents or occupants. (See entire Aff. (SUONG-000478 – 000538).

The Affidavit fails to state the following information about the transaction, SUONG

or any  activity associated with his residence sufficient to establish justification for a search

of the premises at 71 Corbett Street, Lowell, MA: (1) whether any drug transaction ever

occurred at or within the home, (2) whether SUONG was observed participating in any drug

transaction (3) what past activities and or facts establish SUONG to be a drug dealer (4) what

facts permit the supposition that there are accoutrements of drug activity such as mixing

agents, scales, drug ledgers, a finger press, baggies, etc. to suggest that either 71 Corbett

11

Street was a "stash" house or a location at which drugs were frequently sold, especially where there is absolutely no showing that any drug activity has occurred at 71 Corbett Street or that SUONG has engaged in any such activity at 71 Corbett Street or elsewhere  (4) whether any FBI confidential informant or cooperating agent has ever observed SUONG with drugs or be present at any drug transaction (5) whether any cellular or telephonic device was used by SUONG to accomplish a drug transaction (6) whether SUONG is known to have handled any drug money whatsoever (7) whether there have been any, earlier to November, 2020, phone calls between YUT and SUONG (or between SUONG and anyone else) that have been recorded wherein the conversations discussed drugs, kinds of drugs, quantity of drug, methods of delivery, contents of mailed packages, money shipped through USPS services. Notably, Zaremba's affidavit, moreover, fails to state that any agent saw (1) drug activity at 71 Corbett Street, (2) any visitors, including YUT come from or to the 71 Corbett Street address with frequency or regularity suggestive of drug activity, (3) SUONG in the company or vicinity of YUT or any of his cohorts like PIN or KEO (3) SUONG  in any drug activity. The Affidavit, moreover, fails to state that any agent heard (4) SUONG's voice on any wiretapped or consented-to telephone, or cellular phone, or call(s), (5) SUONG's voice during any drug transaction, (6) SUONG's recorded voice at any time during the investigation, or (7) any facts to substantiate that SUONG possessed any weapon at 71 Corbett Street.

Zaremba then addresses with unfounded boilerplate assertions his justification for the search of SUONG'S residence. ¶¶ 43(a)-(i), (SUONG-000502 – 000506) He claims that drug traffickers store drug-related paraphernalia and records at their homes for longer periods than they keep drugs at their residences, that they find necessary the storing of large sums of cash

12

and records relating to the ordering, sale and distribution of controlled assets and money in paper and/or electronic media, that they keep records of amounts they "front" to drug purchasers and keep names, addresses and photographs of clients and suppliers and associates and "selfies", commonly conceal such records and hide controlled substances and/or proceeds of drug sales, have safes, suitcases and like containers and/or "stash" places to store drugs, records or money and maintain identification evidence at their premises. (SUONG-000502 – 000506). The "boilerplate," however does not apply to SUONG. As he is never seen to have received or distributed drugs and is never seen to have carried drugs from or to his residence, there is no reason to assume he will have any at his premises or that he would maintain such records at his premises. The one described incident upon which Zaremba relies, a suspected drug proceeds, the parcel of November 3, 2020, appears, according to Zaremba, to contain money, not drugs, so no reason exists to suspect SUONG has drugs at his premises. This entire incident recounted by Zaremba shows that the parcel never gets into SUONG's hands or residence, but only into YUT's hands, so there is no reason to believe and assert that SUONG would have either money from drug transactions or monetary records relating to drug transactions at his residence. Nor is there any reason to assume, given the sole transaction, that SUONG would keep customer lists or ledgers at his premises where the contents of the one solitary parcel appear to be money, never received by him.

Zaremba then asserts that SUONG lives at the Target Premises, lists his address as the Target Premises, has used cars registered to persons who reside at the Target Premises and has been encountered there many times, according to Lowell Police Department records. (¶ 44) (SUONG-000506) He asserts that SUONG uses phone 8091 which is listed with the Target premises and that SUONG's cellphone number appears in YUT's and PIN's phone

13

listings. (¶ 45) (SUONG-000506 - 000507) He notes that for a nearly 7-month period of time, YUT's and SUONG's phones had 207 text messages and 38 telephone calls, but without knowing the contents of these communications between YUT and SUONG, their mere numerosity adds nothing to his probable cause calculations. (¶ 45) (SUONG-000506 - 000507)

Although Zaremba generalizes his experience with the way cellphones are used in many drug transactions, he cannot show that any cell phone was used by SUONG in this manner in this transaction so as to connect it to SUONG's residence at 71 Corbett Street, Lowell, MA.

Zaremba speaks to the fact that SUONG's Cash App transactions identify 13 transfers from a review of YUT's account over a 15 month period of time, from October, 2018 to January, 2020, of $5,320, concluding 5 months before his application for the search warrant was allowed, but Zaremba provides neither correlation between the funds received by SUONG  and payments from YUT's dealing with illegal narcotics nor connection to the November, 2020 parcel. (¶ 46) (SUONG-000507) (See entire Aff. (SUONG-000478 – 000538). From these assertions, Zaremba, however, concludes that SUONG's cellphone "**likely** contains evidence of the Target Offenses" (emphasis supplied), including the specific text message communications of November 16, 2020 but nowhere does he back up this speculation with facts. (¶ 47) (SUONG-000507) (See entire Aff. (SUONG-000478 – 000538). Zaremba then describes drug traffickers' common uses of cellphones, including the storage of drug or drug-related monetary records (¶ 47) (SUONG-000507 - 000508) and suggests other evidence likely to be found at SUONG's residence such as SUONG's ownership of a Cash App account. (¶ 48) (SUONG-000508) Zaremba then asserts the typical

"laundry list" set forth in Attachment B to search for at the Target Premises but without setting forth factually specified drug activity on the part of SUONG throughout his affidavit, Zaremba's quest for probable cause evaporates. (See entire Aff. (SUONG-000478 – 000538).

In the remaining portions of his affidavit, he discusses the "boilerplate" that typically surrounds the seizure of computer equipment and data and the need to examine the contents of the computer, (¶¶ 53-58)[2] (SUONG-000509 – 000518) and the potential need to have an unlocked device using biometric features (¶¶ 59-63) (SUONG-000518 – 000519) before reaching his conclusion.

While Zaremba's generalized comments do apply to several facts involving YUT and may justify his conclusions that YUT should be arrested and that his residence and other physical facilities, because they were involved in multiple transactions, should be searched, his comments cannot and did not justify his conclusion that SUONG's residence at 71 Corbett Street should be searched.

The Purpose of Zaremba's affidavit was to establish probable cause to obtain a search warrant for 71 Corbett Street, Lowell, MA and telephones and computers located therein. (¶¶ 7-10) (SUONG- 000489 - 000490)

This memorandum is concerned only with the lack of probable cause and lack of nexus to obtain a search warrant for 71 Corbett Street, Lowell, MA and certain telephones located therein.

<div align="center">

**Execution of the Search Warrant**

</div>

---

[2] There appears to be no ¶¶ 50-52.

On June 10, 2021, several federal agents executed the search warrant at the residence at 71 Corbett Street, Lowell, MA. (¶ 13, Doc. 13-6) During the search, SUONG was initially detained and later arrested at the residence. (¶¶ 15, 24, Doc. 13-6) Several items were seized during the search, including an unloaded firearm and ammunition (See detention hearing transcript June 14, 2021 and exhibits submitted therein.)

## ARGUMENT

### I.     SUONG Has Standing to Challenge the Entry Into His HOME.

"[W]hen it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Florida v. Jardines*, ___ U.S. ___, 133 S. Ct. 1409, 1414 (2013), *quoting Silverman v. United States*, 365 U.S. 505, 511 (1961).  Here, law enforcement agents armed with a search warrant entered into SUONG'S home and conducted a search.  SUONG, as a resident of significant, long-lasting duration at 71 Corbett Street, his home, has standing to contest the search.  SUONG, when agents entered his living areas of his multi-room home had a reasonable expectation of privacy in his home.  Whether a resident has a reasonable expectation of privacy in his home is linked to "the proper characterization of the building itself."  *United States v. Werra*, 638 F.3d 326, 331 (1st Cir. 2011).

The resident of a dwelling, a traditional home, possesses a reasonable expectation of privacy throughout the interior of the premises.  *Werra*, 638 F.3d at 331, *citing Payton v. New York*, 445 U.S. 573, 590 (1980).

"[T]he expectation-of-privacy inquiry requires a close, holistic review of the particular record at issue."  *Werra*, 638 F.3d at 332 n.8.  71 Corbett Street fits squarely into

the paradigm for it is a traditional family home, a single-family structure and its residents were SUONG, his common-law wife and the mother of his three children, all of whom were living with him at the premises, his father and mother, as a single family occupying the house together. See *Werra*, 638 F.3d at 332.  Yet, "[even] an unconventional household does not necessarily diminish the protection afforded the residents of the house."  *Id.*, *citing Reardon v. Wroan*, 811 F.2d 1025, 1027 n.2 (7th Cir. 1987) (describing fraternity members as roommates in the same house rather than co-tenants sharing common areas), *State v. Titus*, 707 So. 2d 706, 708 (Fla. 1998) ("The mere fact that certain rooms traditionally associated with a home are shared by rooming house residents does not render the structure any less a home to those residents") and *People v. Garriga*, 189 A.D.2d 236, 596 N.Y.S.2d 25, 28 (N.Y. App. Div. 1993) (internal hallways of rooming house were part of defendant's home); *but see United States v. Anderson*, 533 F.2d 1210, 1214 (D. C. Cir. 1976) (privacy interest began at door to defendant's room rather than door to entire rooming house).

71 Corbett Street, Lowell, MA is a traditional single family home. SUONG had a reasonable expectation of privacy in the entire interior of the single-family home.  When law enforcement entered the home, they violated his Fourth Amendment rights.

**SUONG Had a Property Interest in His HOME**

Even if *Werra* did not clearly establish SUONG'S reasonable expectation of privacy under the *Katz* analysis, SUONG nonetheless has standing to contest the law enforcement entry into his home.  "When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" *Jardines v. Florida*, 569 U.S. 1, 133 S. Ct. at 1414 (2013), *quoting United States v. Jones*, 565 U.S. 400, 132 S. Ct. 945, 950-951 n.3

17

(2012). In *Jardines*, 133 S. Ct. at *passim*, the Supreme Court held that, where the police trespass upon or into the home, a search has occurred, without regard for the *Katz* "expectation-of-privacy" analysis.

Here, SUONG unquestionably had a property interest in the home, where he was provided services as a caregiver at the home to his father, the homeowner, where he viewed it as his home and where he participated in his daily living activities, such as bringing up his children. Because the FBI entered into his home, SUONG may contest their entry as an unlawful search. "That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred." *Jardines*, 565 U.S. 1, 11 (2013)

## II. A SINGLE INSTANCE OF ALLEGED NARCOTICS' ACTIVITY, ON NOVEMBER 16, 2020, WHICH DID NOT OCCUR AT 71 CORBETT STREET, WITHOUT MORE, LACKS ANY ON-GOING PATTERN OF CRIMINAL CONDUCT AND THEREFORE FAILS TO ESTABLISH A NEXUS BETWEEN THE CRIMINAL ACTIVITY AND THE RESIDENCE SOME SIX TO SEVEN MONTHS LATER WHEN THE WARRANT WAS APPLIED FOR AND GRANTED ON JUNE 9, 2021.

One incident does not support a finding that there was on-going criminal activity relating to the home, especially where the alleged illegal activity – the mailing by YUT of, and the obtaining of, the undelivered parcel from the post office by YUT never originated at or otherwise occurred at or within 71 Corbett Street, Lowell, MA. In *United States v. Rosario,* 918 F. Supp. 524, 529 (D.R.I. 1996), Judge Lisi found no nexus to search an apartment even though evidence showed that defendant sold cocaine on one occasion, associated with drug traffickers, and lived at the target address where the one sale of interest did not take place *at* the target residence, hence the District Court found that there was no nexus between the crime and the target residence as a result. Here no facts show this one-

time instance of alleged narcotics' activity to have directly involved the target residence of 71 Corbett Street, and so the facts of *Rosario* are on point.

Instead, what Zaremba attempts to do is assert the opposite, and via bald conclusory statements no less, by claiming that SUONG actually had some repeated involvement in a conspiracy which spanned a several months-long period of time, well separated from and much earlier than the date of the issuance of the warrant, and attempts to rely upon the conclusory statements to support his inference that the SUONG's residence was used as a location to "stash" narcotics and retain drug records and drug paraphernalia, - claims which have actually no factual support within the Zaremba affidavit. We can see a snippet of these types of Zaremba's conclusory but baseless assertions that amount to only speculation below:

> (1) "I believe that PARCEL 53523 likely contained drug proceeds, because it fit the pattern of using the mail and using false names; because YUT, who was listed as neither sender nor recipient, (and others) tracked it carefully, as described below; and because YUT and others used a false story in their efforts to retrieve the package, which they likely would not have done with a non-contraband package."

(SUONG – 000499) Zaremba offers no facts to establish that the unopened parcel was drug proceeds. Note that the pattern of using the mail and false names belongs to YUT, not SUONG. While tracking occurs on YUT's phone and a phone Zaremba associated with SUONG, (SUONG 000500), tracking sheds no illumination on the contents of the parcel. No facts establish either that SUONG used a false story or that he made efforts to retrieve the package.

> (2) "I believe that YUT, using Phone 3292, was tracking 53523 because it contained drug proceeds."

(SUONG – 000500, 000501) As the parcel was never opened, Zaremba could only speculate as to its contents. Probable cause cannot be obtained by speculation. The parcel could have contained drugs or car parts just as easily as it could have contained money. No facts establish that SUONG knew the contents of a parcel that he is never shown to have seen. (See entire Aff. (SUONG-000478 – 000538).

> (3) "Because Phone 8091, which I attribute to SUONG (as described below, tracked PARCEL 53523, I believe that SUONG was interested on YUT's behalf with what happened to the package and was likely attempting to aid YUT in its retrieval. I believe that, because SUONG actually lived at 71 Corbett Street, which – according to YUT's (false) story – was the address of the sender, to whom the parcel would be returned, YUT enlisted the assistance of SUONG with retrieving the package. I further believe that this pattern of phone activity is consistent with YUT and SUONG discussing what may have happened to the Parcel, YUT providing SUONG with the tracking information and SUONG then tracking PARCEL 53523.

(SUONG- 000501) The affidavit is constantly reiterating the theme that SUONG's efforts are for YUT's benefits, not his own. It is speculation to suggest that, when YUT volunteered to the Lowell Post Office supervisor the allegedly false story that the sender failed to list correctly 71 Corbett Street as his return address, YUT enlisted SUONG's aid, because the affidavit sets forth no content of any communication efforts on November 16, 2020 - be it text, email or phone or in person conversation - to have occurred between YUT and SUONG. Without knowing the contents of a single cellphone call between YUT and SUONG, Zaremba describes it, without basis, as a "pattern" and supposes the discussions between these persons to have concerned the parcel and its tracking. Upon making these unestablished assumptions, Zaremba easily but baselessly concludes that the conversations that occurred concerned the retrieval of the Parcel.

> (4) I believe that YUT was aware that the PARCEL 53523 was not delivered to 1202 Camino del Mar, Del Mar, CA and would eventually be returned to the listed sender's address which was 58 Corbett Street, Lowell, Massachusetts. I believe that YUT likely contacted SUONG who resides at 71 Corbett Street with CHOUN which is the "return address" that YUT provided to USPS as part of his story, and that YUT, SUONG and CHOUN conspired to develop a story to explain why the listed return address was not correct. I believe that YUT went to extraordinary measures in an effort to recover PARCEL 53523 because it contained a bulk cash payment for illegal narcotics.

(SUONG – 000502) Zaremba speculates as to YUT's knowledge that the parcel was not delivered and would be returned, but offers no factual foundation on which to build this unstable edifice of YUT's knowledge. Without a single iota of conversation known by him to have been exchanged by YUT or SUONG or CHOUN with each other, Zaremba concocts a conspiracy to square with his beliefs. While his assumptions may be logical or tenable, unsubstantiated by facts, they cannot attain to the level of probable cause.

These baseless assumptions are reminiscent of the townspeople's assumptions in Hans Christian Andersen's fairy tale, the Emperor's New Clothes, where they could not see the clothes, that they described as light and airy, and where the unvarnished truth, established by looking at the obviously naked emperor, caused a child to exclaim: "But he doesn't have any clothes on."

Zaremba's nude affidavit is totally unclothed with probable cause and bare of nexus. See *Spinelli v. United States*, 393 U.S.410, 418 (1969) ("[A] simple assertion of police suspicion is not itself a sufficient basis for a magistrate's finding of probable cause."); *Nathanson v. United States,* ]"209 U.S. 41, 44-48 (I 933) (affiant's statement that "he has cause to suspect and does believe that "liquor brought into the United States was located on certain premises was insufficient to support a finding of probable cause necessary for the

issuance of warrant); *United States v. Vigeant*, 176 F.3d 565, 569 ( 1st Cir. 1999) ("'Mere suspicion, rumor, or strong reason to suspect [wrongdoing]' are not sufficient. *United States v. Han*, 74 F. 3d 537, 541 (4th Cir. 1996)"...warrant affidavit that contained "conclusory statements of the affiant that, "though they might otherwise have helped create probable cause," were "entirely without factual support" and insufficient to establish probable cause)

      Review of Zaremba's affidavit in its entirety reveals that SUONG's actual "role" merely consisted of a one-time instance of SUONG being in alleged multiple communications with YUT from a non-specific location on November 16, 2021. There was no mention anywhere within the affidavit of any "facts," adduced during the alleged communications showing any discussion of the contents of the parcel. Nor is there throughout the affidavit any "facts" showing or suggesting that SUONG used 71 Corbett Street (repeatedly or otherwise) as a repository or "stash" for narcotics, nor was there any mention anywhere within the affidavit about repeated  or protracted participation by SUONG in YUT's drug trafficking conspiracy, let alone SUONG responding to any repeated requests for sales, or SUONG seen coming or going non-stop from or to 71 Corbett Street after arriving at or departing from locations at which drug transactions or activities occurred. Nor was it shown within the Affidavit that SUONG was at the residence at the time he engaged in these alleged communications with YUT.

      In short, a careful review of Zaremba's affidavit reveals its unsuccessful and untruthful attempt to cause SUONG to become inveigled in YUT's litany of drug activities. If we eliminate these inaccuracies and consider only what is true in the affidavit, we have by SUONG on November 16, 2020 multiple communications at an unspecified location allegedly about a single parcel of alleged drug monies that, standing alone, would not be a

"substantial basis" to search SUONG's residence on June 9-10, 2021, 6 months, 24 days later.

Staleness in search warrant affidavits hinges upon whether the affidavit describes a single transaction or a continuing pattern of criminal conduct. Temporal proximity or remoteness of the events observed has a bearing on the validity of a warrant. In *Rosencranz v. United States*, 356 F. 2d. 310, 315-16, n.3 (1st Cir. 1966), the Court said:

> The basic principle that there be enough basis for the magistrate to conclude that probable cause exists at the time he issues his warrant has been stated in *Sgro v. United States*, 1932, 287 U.S. 206, 53 S. Ct. 138, 77 L. Ed. 260. In *Poldo v. United States*, 9 Cir., 1932, 55 F.2d 866, the court, after commenting that the affidavit lacked a date of observation, said, 55 F.2d at 868, "Time of the affidavit's observations, which are set forth as constituting probable cause that a crime has been committed, is of the essence of the affidavit." In *Kohler v. United States*, 9 Cir., 1925, 9 F.2d 23, the court referred to the failure to fill in the spaces for the day and month of alleged possession and sale of liquor as one of the "glaring" defects in the affidavit. In *Staker v. United States*, 6 Cir., 1925, 5 F.2d 312, an affidavit was silent as to time. The court said, 5 F.2d at 314, "So far as the affidavit shows, the officer might have smelled the fumes months before the affidavit was made." In *Conti v. Morgenthau*, S.D.N.Y., 1964, 232 F. Supp. 1004, the court held invalid an affidavit alleging the placing of wagers on certain dates at an apartment and two undated visits of defendant to the apartment. It pointed out the lack of connection of the visits and the wagers, the failure to allege dates "or indeed that the visits were recent". In *United States v. Bosch*, E.D.Mich., 1962, 209 F. Supp. 15, an affidavit silent as to when surveillance was made, was held invalid. While not the only reason for its decision, the court indicated that the absence of time allegation would have been a sufficient basis. In *Williams v. Commonwealth*, Ky., 1962, 355 S.W.2d 302, where the affidavit alleged that defendant "has in his possession at this time beer and whiskey * * * for the purpose of sale", the court held that it was defective for not disclosing when the underlying observation was made. In *Odom v. State,* 1932, 121 Tex.Cr.R. 209, 50 S.W.2d 1103, where the affidavit alleged that certain "equipment is being used", the court held it defective for not revealing that the conduct occurred within a reasonable time. In *People v. Musk*, 1925, 231 Mich. 187, 203 N.W. 865, an affidavit that affiant "has seen" certain things was held invalid for lack of a time averment....
>
> **Corroborating the traditional interest of the courts in being able to fix the time of observation of the underlying facts asserted in affidavits are the**

> **many cases where the validity of the warrant was determined by the proximity or remoteness of the events observed. See *Schoeneman v. United States*, 1963, 115 U.S.App.D.C. 110, 317 F.2d 173 (107 days -- invalid); *Irby v. United States,* 314 F. 2d 251, 253 (D.C. Cir. 1963), (8 days -- valid); *Dandrea v. United States*, 8 Cir., 1925, 7 F.2d 861 (42 days -- invalid); *United States v. Sawyer*, D.C. 1963, 213 F. Supp. 38 (107 days -- invalid); *United States v. Long*, D.D.C., 1959, 169 F. Supp. 730 (11 days -- valid); *United States v. Allen*, E.D.Ky., 1957, 147 F. Supp. 955 (16 days -- valid); *United States v. Nichols*, W.D.Ark., 1950, 89 F. Supp. 953 (21 days -- invalid).**

(Emphasis supplied.) There is no bright line rule for determining the staleness of information regarding drug trafficking and a nexus to the location to be searched. See *United States v. Trinh*, 665 F. 3d. 1, 13 (1st Cir. 2011), quoting *Walczyk v. Rio*, 496 F. 3d 139, 162 (2nd Cir. 2007) ("[t]he law sensibly draws no bright- line rule for staleness.") The value of such evidence, however, may turn upon whether the alleged drug activity can be appropriately described as ongoing and continuous. *United States v. Nocella,* 849 F. 2d 33, 39-40 (1st Cir. 1988) (denying motion to suppress where the evidence -- multiple controlled buys from the defendant over the course of months "showed persuasively that the defendant's criminal activity was velivolant").[2] This holding demonstrates that, as far back as 1988, the First Circuit makes clear that it is more persuaded by a continuing pattern of criminal conduct as opposed to one single transaction. This principle is highlighted when the First Circuit stated that:

_____

2. *See generally* Mascolo, "The Staleness of Probable Cause in Affidavits for Search Warrants: Resolving the Issue of Timeliness," 43 Conn.BJ. 189 (1969); Comment, "A Fresh Look at Stale Probable Cause: Examining the Timeliness Requirement of the Fourth Amendment," 59 Iowa L. Rev. 1308 (1974).

_____

> "'By its very nature, drug trafficking, if unchecked, is apt to persist over relatively long periods of time. See *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986). We agree with the Fifth Circuit that a 'primary consideration in evaluating the staleness issue is whether the affidavit describes a single transaction or a continuing pattern of criminal conduct.' *United States v. Tucker*, 638 F.2d 1292, 1299 (5th Cir., Unit A), *cert. denied*, 454 U.S. 833, 70 L. Ed. 2d 111, 102 S. Ct. 132 (1981); *see also United States v. Gann*, 732 F.2d 714, 722 (9th Cir.), *cert. denied*, 469 U.S. 1034, 83 L. Ed. 2d 397, 105 S. Ct. 505 (1984). That is particularly true in the shadowy world of drug dealings.'"

*Nocella*, at 40 (Emphasis supplied.) Although drug trafficking is "apt to persist over relatively long periods of time", *id.,* evidence can be stale when it fails to demonstrate a continuing pattern of drug activity. See *United States v. Kosta*, No. 2013 U.S. Dist. LEXIS 156956 at *13-24 (D. Mass. 2013) (Court suppressed evidence from defendant's residence, where there was no factual basis (or freshened probable cause) for believing that the drug trafficking organization continued or had any continued nexus to the defendant's residence and good faith exception does not apply). Cf. *United States v. Feliz*, 182 F. 3d 82, 87 (1st Cir. 1999) (court finding that "drug trafficking was of a continuous and ongoing nature" based upon two informants having firsthand observations of the defendant's drug trafficking, coupled with claims that the defendant had sold cocaine as early as 1985, along with controlled buys from the defendant in September prior to the year-end search warrant). Zaremba's affidavit which seeks to search 71 Central Street is 40 pages, and spans a 27 month time period between August, 2018 and November, 2020. During that lengthy period of time however, SUONG is mentioned on just one day, November 16, 2020, as "participating" in drug activity.   However, YUT who has been established as a prolific drug trafficker has his name peppered throughout the Zaremba affidavit, from beginning to end. Although YUT's status as a drug trafficker is solidified upon review of the affidavit, the exact nature of

his relationship with the Defendant is somewhat murky.   Indeed, the Defendant cites to the affiant's assertions of his own beliefs, *supra*, never offered by the affiant as facts as support thereof. Zaremba's affidavit suggests mere "possibilities" about what could be going on between the two, because Special Agent Zaremba doesn't have enough evidence to know any "probabilities." At this point all the affiant knows about is one isolated instance of two people arguably discussing how to retrieve and track a parcel. It is unclear ***what*** the unopened and uninspected parcel contains even though Zaremba posits its contents as drug proceeds. That the parties had communications with one another, the contents of which are unknown is suggestive of nothing. See *United States v. Roman*, 942 F. 3d 43, 54-55 (2019) ("This is not a case where the affidavit recites[s] facts establishing a ***clear and substantial*** connection between the illegal activity and the place searched"; rather the government's argument relies upon ***"speculative inferences piled upon inferences"*** that [the Defendant's] residence would yield relevant evidence. (Emphasis supplied.) The point is there is no way to know what YUT sought from SUONG or vice versa during their communications. In essence, Zaremba believes he has probable cause to search SUONG'S residence, simply because SUONG had communications with YUT on the day that YUT attempted retrieval of a parcel from the post office. Actually, and to be sure, the affidavit is silent on any criminal activity taking place on the date of the communications involving SUONG, and particularly the residence for which the Zaremba affidavit seeks a search warrant. This affidavit merely suggests criminal activity on one isolated occasion, and that, alone does not amount to a conspiracy. See *United States v. Izzi*, 613 F.2d 1205, 1210 (1980) ("A single sale of drugs without more does not establish a conspiracy"). In *Izzi*, at 1209-1210, the Court finding insufficient connection to the conspiracy by Izzi, offers telling similarities to the case at bar:

26

the government argues that evidence of telephone calls made from Puerto Rico by Cuevas on October 4 and 6 to Santos in Chicago and de Jesus in New York indicates a continuing conspiracy. These calls were not tapped and, therefore, their contents are not known. While it may be inferred that the calls concerned drugs, that is as far as any inference can take us. They are not evidence of a link between Santos, de Jesus, and Somosa's November trip to Chicago. Nor does the evidence of the December calls from Somosa to Santos forge a connection between the November purchase from Santos and Izzi and the conspiracy that started in late April. All they show is an attempt by Somosa to purchase five kilograms of heroin from either Santos or de Jesus. Based on the evidence, we can only conclude that there was a conspiracy to possess and distribute heroin involving Cruz, Santos, and Cuevas which commenced in late April of 1976 and terminated on August 20.

Indeed, the evidence is slim that there was any kind of a conspiracy in November among Somosa, Izzi, and Santos. A single sale of drugs without more does not establish a conspiracy. *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.), Cert. denied, 439 U.S. 958, 99 S. Ct. 361, 58 L. Ed. 2d 351 (1978); *United States v. Varelli,* 407 F.2d 735, 748 (7th Cir. 1969), Cert. denied sub nom. *Saletko v. United States*, 405 U.S. 1040, 92 S. Ct. 1311, 31 L. Ed. 2d 581 (1972). There must be an agreement by the parties, not merely a getting together to consummate the transaction. "It has been long and consistently recognized by the Court that the commission of the substantive offense and a conspiracy to commit it are separate and distinct offenses." *Pinkerton v. United States*, 328 U.S. 640, 643, 66 S. Ct. 1180, 1182, 90 L. Ed. 1489 (1946).

While it might be argued that the calls from Somosa to Santos prior to the actual sale established a conspiracy between them, this clearly does not extend to Izzi. But whether we treat the November sale as a culmination of conspiracy or simply a substantive crime, there is no evidence linking Izzi to the conspiracy that started at the end of April. Izzi's name was not mentioned at all by the other conspirators at any time and he did not enter the picture until the November sale in East Chicago.

In the case at bar, as in *Izzi,* the Government will argue that the YUT-SUONG communications indicate a continuing conspiracy. In the case at bar, as in *Izzi,* the calls were not tapped, and the texts and emails were unread by FBI agents and their contents are unknown. Any inference that they concerned the parcel are not evidence of a link between YUT, PIN, KEO and SUONG. The Government can show no agreement between SUONG and anyone else to join the conspiracy headed by YUT. Note that the parcel had been shipped

and returned by the time SUONG has communication with YUT so that his acts do not link to any conspiracy that began in 2018. Like Izzi, SUONG's name is not mentioned at all by the other conspirators (or by any informant) at any time and SUONG did not enter the picture until November 16, 2020, until after the parcel returns to the Lowell post office.

In *United States v. DeLutis,* 722 F. 2d 902, 905-906 (1st Cir. 1983), the First Circuit accepting Delutis' argument that there was insufficient evidence to show his agreement to enter a conspiracy said:

> The only evidence in the case from which the necessary inferences must be made was DeLutis' telephone conversations with agent Shay and his trip to Shirley's house with nearly $ 5,000 in cash on his person. This evidence shows an isolated or single act that is comparable to single sales or purchases of narcotics or other isolated single acts discussed below in connection with court decisions where such acts, without more, have been held to be insufficient to convict the accused as a coconspirator in a narcotics conspiracy case. In this regard, we have held that sufficient proof of specific intent or knowledge or acquiescence in a larger conspiratorial scheme ordinarily is not supplied by inference from one isolated act. *United States v. Hernandez*, 625 F.2d 2 (1st Cir. 1980). In *United States v. Magnano*, 543 F.2d 431 (2nd Cir. 1976), *cert. denied sub nom DeLutro v. United States*, 429 U.S. 1091, 97 S. Ct. 1100, 51 L. Ed. 2d 536 (1977) the court held that a single act is insufficient to link a defendant with an overall conspiracy when there is no independent evidence tending to show that the defendant had some knowledge of the broader conspiracy, and when the single transaction is not in itself one from which such knowledge might be inferred.

The Zaremba affidavit recites "no independent evidence tending to show that [SUONG] had some knowledge of the broader conspiracy, and [] the single transaction [of the parcel] is not in itself one from which such knowledge might be inferred." *Id.* See *United States v. Hernandez,* 625 F. 2d. 2 (1st Cir. 1980) (one isolated act cannot serve as the basis to infer specific intent, knowledge, or acquiescence in a larger conspiratorial scheme). The aforementioned cases tell us what the Government cannot dispute - that there is insufficient

evidence to infer that SUONG, or his residence for that matter, can be attributed to any type of drug trafficking conspiracy involving YUT or his cohorts.

The Zaremba affidavit failed to provide a sufficient factual basis for the judicial officer who approved his warrant application, to believe that evidence of narcotics dealing would be at 71 Central Street. The affidavit spanned a period of several months, and over that time period demonstrated allegedly one lone instance of narcotics' activity at an unspecified location, a single instance that would be insufficient as a matter of law to permit a search of 71 Central Street, SUONG'S residence for the single instance which occurred 6 to 7 months earlier to the search. As a result, Zaremba's affidavit not only lacks probable cause, but also the epitome of a bare-bones affidavit, which renders the good-faith exception inapplicable to save it.

### III.    The Totality of the Circumstances Described in the Application for Search Warrant and Supporting Affidavit Failed to Supply Probable Cause to Search 71 Corbett Street, Lowell, MA. on June 9 and 10, 2021.

The totality of the circumstances described in the Application for Search Warrant and Supporting Affidavit fails to demonstrate probable cause to believe that evidence of drug distribution would be found inside of SUONG's home.  Among other things, the Application for Search Warrant And Supporting Affidavit (1) fail to set forth any basis of knowledge for several assertions, including, without limitation, that drugs and drug ledgers and drug paraphernalia were likely to be at 71 Corbett Street, Lowell, MA and (2) fail to demonstrate sufficient "nexus," to suggest that evidence of a crime or crimes would be found at 71 Corbett Street, Lowell, MA.  The circumstances described in the application for the warrant fail to establish a "fair probability that contraband or evidence of a crime [would] be found" on June 9-10, 2021 within SUONG's home.  Thus, the entry into, and search of, the home

violated SUONG's rights to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

The Fourth Amendment provides as follows:

The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

Probable cause for the issuance of a search warrant is to be determined by the totality-of-the-circumstances described in the application for the warrant. *Illinois v. Gates*, 462 U.S. 213, 230-239 (1983). The test is "whether the sworn allegations are sufficient 'to warrant a man of reasonable caution in the belief that an offense has been or is being committed and **that evidence bearing on that offense will be found in the place to be searched.'"** *United States v. Clark*, 685 F.3d 72, 75 (1st Cir. 2012), *quoting Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 370 (2009) (Emphasis supplied). The knowledge of the law enforcement officer must give rise to a "fair probability," a "substantial chance," of discovering evidence of criminal activity. *Redding*, 557 U.S. at 371, *citing Gates*, 462 U.S. at 238, 244 n.13.

An assessment of probable cause depends, on occasion, upon the quality of information received from an informant. "The *Gates* Court agreed that the *Aguilar* and *Spinelli* factors, including 'an informant's "veracity," "reliability" and "basis of knowledge" are all highly relevant in determining the value of his report.'" *United States v. Khounsavanh*, 113 F.3d 279, 284 (1st Cir. 1997), *quoting Gates*, 462 U.S. at 230; *see Aguilar v. Texas*, 378 U.S. 108, 114 (1964) and *Spinelli v. United States*, 93 U.S. 410, 416 (1969) (collectively, requiring showing of circumstances from which informant concluded narcotics

were where he claimed [basis of knowledge] and circumstances from which officer

concluded informant was credible or his information reliable [veracity]).  The First Circuit

has given a non-exhaustive list of factors that a magistrate or reviewing court may consider:

> Among others, the factors that may contribute to a "probable cause"
> determination include whether an affidavit supports the probable " 'veracity'
> or 'basis of knowledge' of persons supplying hearsay information"; whether
> informant statements are self-authenticating; whether some or all the
> informant's factual statements were corroborated wherever reasonable and
> practicable (e.g., through police surveillance); and whether a law-enforcement
> affiant included a professional assessment of the probable significance of the
> facts related by the informant, based on experience or expertise.  None of
> these factors is indispensable; thus, stronger evidence on one or more factors
> may compensate for a weaker or deficient showing on another.

*Khounsavanh*, 113 F.3d at 284, *quoting United States v. Zayas-Diaz*, 95 F.3d 105, 111 (1st

Cir. 1996).

    In the case at bar, however, Zaremba's affidavit recites no information received from

any confidential informant asserting reliable data to cause a belief that SUONG dealt in drugs

or that SUONG acquired drugs or that SUONG stored drugs or drug paraphernalia at 71

Corbett Street, Lowell, MA.  (See entire Aff. (SUONG-000478 – 000538).

    If law enforcement took any steps to corroborate by surveillance that 71 Corbett

Street was a stash house or a place at which drug records would be maintained, Zaremba

unaccountably fails to mention their steps in his affidavit.  Note that YUT, PIN, KEO and

other individuals who were surveilled are never seen to have frequented 71 Corbett Street,

and Zaremba fails to demonstrate any information to connect those individuals to 71 Corbett

Street or to demonstrate that any individual who lived at 71 Corbett Street engaged in any

drug transaction at all, at any time.

While Zaremba's affidavit perhaps supports a finding of probable cause to believe that YUT was a drug seller, as were his co-conspirators PIN and KEO, it fails to support a finding of probable cause to believe that any drug deal occurred at the 71 Corbett Street home.  A warrant application must demonstrate not only probable cause to believe that a crime has been committed but also that enumerated evidence of that offense will be found **at the place to be searched - the "nexus" element**.  *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999), *citing Zayaz-Diaz*, 95 F.3d at 111.  As discussed, *infra*, Zaremba's total information obtained from review of records from the observations of fellow FBI agents appear to place any such operations at the locations of 17 Walker Street, Lowell, MA, 438 Butman Road, Lowell, MA, 70 3rd Avenue, Waltham, Ma, 37 Greendale Avenue, Lowell, MA, Bartlett Court, Lowell, MA and 105 Tanner Street, Lowell, MA, because Yut and his cohorts, but not SUONG, are observed there shortly before, during or after drug transactions have taken place, but never at the 71 Corbett Street, Lowell, MA location. (SUONG-000491 – 000494) Nor do the multiple boilerplate assertions as to what frequently happens in drug conspiracies supply the necessary element of nexus, where that information has no demonstrable basis in fact so as to relate to SUONG.

The totality of the circumstances described in the application for the warrant fail to establish a "fair probability that contraband or evidence of a crime [would] be found" on June 9-10, 2021 within 71 Corbett Street, Lowell, MA.  As such, the FBI entry into the dwelling and subsequent search were conducted in violation of SUONG'S rights under the Fourth Amendment.

**IV. A Search of the Four Corners of the Warrant and Affidavit Reveals
Insufficient Facts to Establish Nexus to 71 Corbett Street, Lowell, MA.**

As the affidavit fails to establish that at any time any drug transaction occurred at 71

Corbett Street, Lowell, MA, the warrant and affidavit fail to establish that SUONG stored

drugs, drug paraphernalia or drug records at 71 Corbett Street, Lowell, MA. In short, the

warrant and affidavit fail to establish requisite nexus to the TARGET PREMISES of 71

Corbett Street, Lowell, MA so as to permit a search warrant to have issued.

> The "very core" of the Fourth Amendment is to be "free from
> unreasonable governmental intrusion" into one's home. *Florida v. Jardines*,
> 569 U.S. 1, 6, 133 S. Ct. 1409, 185 L. Ed. 2d 495 (2013) *(quoting Silverman v.
> United States*, 365 U.S. 505, 511, 81 S. Ct. 679, 5 L. Ed. 2d 734 (1961)).
> Indeed, the home is "first among equals" in Fourth Amendment protection.
> *Jardines*, 569 U.S. at 6; see also *Morse v. Cloutier*, 869 F.3d 16, 23 (1st Cir.
> 2017) (the home "is shielded by the highest level of Fourth Amendment
> protection") (internal quotation marks omitted). These bedrock principles
> guide our analysis and disposition.

> An application for a warrant "must demonstrate probable cause to
> believe that (1) a crime has been committed—the 'commission' element, and
> (2) enumerated evidence of the offense will be found at the place searched—
> the so-called 'nexus' element." *United States v. Dixon*, 787 F.3d 55, 59 (1st
> Cir. 2015) (quoting *United States v. Feliz*, 182 F.3d 82, 86 (1st Cir. 1999)). A
> magistrate judge considering the "nexus" element must "make a practical,
> common-sense decision whether, given all the circumstances set forth in the
> affidavit before him," there exists a "fair probability" evidence will be found
> in the place to be searched. *Feliz*, 182 F.3d at 86 (quoting *Illinois v. Gates*,
> 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983)). And, while
> reviewing courts generally afford substantial deference to a magistrate's
> determination of probable cause, where "[a]llegations of intentional or
> reckless misstatements or omissions" are proven true, we owe "no deference
> to a magistrate's decision" because this "implicate[s] the very truthfulness, not
> just the sufficiency, of a warrant application." *Burke v. Town of Walpole*, 405
> F.3d 66, 82 (1st Cir. 2005).

*United States v. Roman*, 942 F. 3d 43, 50 (1st Cir. 2019); see also *United States v. Ribiero,* 397

F. 3d 43, 49 (1st Cir. 2005).

*Roman* sets forth the applicable analysis and is governing precedent in this matter. Roman was charged with a cocaine distribution conspiracy and cocaine possession. DEA Agent Smith drafted an affidavit supporting a search warrant for seven locations including a Chicopee residence that the agents believed to be Roman's home. *Id*. at 46. The affidavit recited a series of meetings between Roman and others and, unlike the affidavit in the case at bar, gave reasons that it had probable cause to search the Chicopee home. *Id.* at 47. The trial court found that the affidavit, reformed after a *Franks* hearing, "did not create a sufficient link between the criminal activity and the home" and suppressed the evidence derived from the search of the home. *Id.* at 49.

Noting that the affidavit was devoid of information from a confidential informant or any other source to show that Roman conducted drug related activity from or kept drug related evidence at the home, that any of his vehicles were found at or travelled to the home, that any meetings of coconspirators had occurred there or that Roman had been observed there, the Court found no nexus. *Id.* at 50. The Court of Appeals affirmed. It said:

> The nexus element requires a showing that "enumerated evidence of the offense will be found <u>at the place searched</u>." *Dixon,* 787 F.3d at 59 (emphasis added). **The inquiry is not whether "the owner of the property is suspected of crime" but rather whether "there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought."** *Zurcher v. Stanford Daily,* 436 U.S. 547, 556, 98 S. Ct. 1970, 56 L. Ed. 2d 525 (1978)

*Roman*, at 51 (underlined emphasis in original; bold emphasis added). The Court of Appeals explained at 51-52:

> A "nexus . . . need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime].'" Feliz, 182 F.3d at 88 (alteration in original) (quoting *United States v. Chares*t, 602 F.2d 1015, 1017 (1st Cir.

1979)). This follows from the well-settled principle that "a probable cause determination is fundamentally a fact-specific inquiry" where "[n]o one factor possesses talismanic powers." *United States v. Khounsavanh, 113 F.3d 279, 285 (1st Cir. 1997)*.

But we have not permitted this inference to be applied lightly. We have made clear that we "do not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence." *Feliz,* 182 F.3d at 88. As such, we have rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity. *Khounsavanh,* 113 F.3d at 285. We have further "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." *United States v. Bain,* 874 F.3d 1, 23-24 (1st Cir. 2017)(citation omitted), cert. denied, 138 S. Ct. 1593, 200 L. Ed. 2d 780 (2018). Accordingly, we have found that "generalized observations" of this type should be "combined with specific observations," or facts "connecting the drug dealing to the home" to permit  an inference of nexus to a defendant's residence. [*United States v.]Ribeiro,* 397 F.3d at 50-51[1st Cir. (2005)]; *Bain,* 874 F.3d at 24. Examples of such "specific observations" include evidence that drug distribution "was being organized from [the defendant's] residence," *United States v. Keene,* 341 F.3d 78, 82 (1st Cir. 2003), that the defendant used his home as a communications hub for drug activity, *United States v. Rivera,* 825 F.3d 59, 64-65 (1st Cir. 2016), or that the defendant "move[d] back and forth from his residence in relation to drug transactions," *Ribeiro,* 397 F.3d at 51.

In *Roman*, at 53, as in the case at bar, the affidavit offered information that permitted application for warrants at other locations and the Court determined that "'any inference that could permissibly be drawn from [Roman's] status as a drug dealer regarding the location of evidence is significantly weakened where, as here it is more likely that such evidence would be found at the residence or business of another individual'- Gonzalez." Zaremba recounted YUT's PIN's and KEO's drug activity at the above-mentioned locations where drug sales were planned or occurred, where it was therefore more likely that evidence of their drug activities and records would be found at their home. "Common sense also says that when a criminal peddles narcotics 'outside his home,' one can infer that 'evidence of his drug dealing

activity' will be found 'in the home,' at least when he is spotted 'leaving the home immediately prior to selling drugs.' *See United States v. Barnes,* 492 F. 3d 33, 37 (1st Cir. 2007*)."* *United States v. Rivera,* 825 F. 3d 59, 63 (1st Cir. 2016). Zaremba, however, never reports similar activity performed by SUONG.

> [I]t is reasonable to conclude that there is evidence of . . . drug dealing activity in the home . . . when the defendant is observed leaving the home immediately prior to selling drugs." [*Barnes*],492 F.3d at 37, 38 (concluding — "given both that the [confidential informant] stated that Barnes lived at the [target] residence and that the police observed Barnes exit the [target] residence, drive away, and sell drugs on the day of his arrest and the search" — that "the totality of the circumstances strongly suggested that there was evidence of drug dealing at the [target] residence").

*Rivera, supra* at 65. While the Zaremba affidavit provides facts sufficient to demonstrate that drug records, paraphernalia and phones are located at YUT's home, no facts show that such materials would be present at 71 Corbett Street where no one is seen entering and shortly thereafter exiting the premises, with a bag or parcel and proceeding directly to another location for a sale to another who immediately thereafter left with the drugs; such activity Zaremba recounts in his affidavit as to YUT, PIN and KEO, but not SUONG.  "[T]he focal point of the magistrate's inquiry" should have been, but clearly was not, "whether there is probable cause to think that the contraband will be at the place to be searched at the time of the contemplated intrusion," the execution of the search warrant. *United States v. Ricciardelli*, 998 F. 2d 8, 11(1st Cir. 1993). "The Magistrate lacked a 'substantial basis for...conclud[ing]' 'that probable cause existed.'[*Gates, supra*, 462 U.S. at 238-239]*" United States v. Bregu*, 948 F. 3d 408, 417 (1st Cir. 2020) and he should never have issued the search warrant for 71 Corbett Street, Lowell, MA.

As the Court of Appeals has said in *United States v. Faust*, 853 F. 3d 39, 46 (1ˢᵗ Cir. 2017)

> [W]e afford an ample amount of deference to the issuing magistrate's finding of probable cause" when reviewing **if an affidavit supports the issued warrant.** *United States v. Dixon*, 787 F.3d 55, 58 (1st Cir. 2015) (citations omitted). As a result, **we will reverse a finding of probable cause "only if we see no substantial basis for concluding that probable cause existed.**" Id. at 59 (quoting *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005)). Probable cause is present if "the facts and circumstances as to which police have reasonably trustworthy information are sufficient to warrant a person of reasonable caution in the belief that evidence of a crime will be found." *United States v. Silva*, 742 F.3d 1, 7 (1st Cir. 2014) (quoting *Robinson v. Cook,* 706 F.3d 25, 32 (1st Cir. 2013)).
>
> "A warrant application must demonstrate probable cause to believe that (1) a crime has been committed-the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched-the so-called 'nexus' element." *United States v. Rodrigue,* 560 F.3d 29, 32-33 (1st Cir. 2009) (quoting *Ribeiro,* 397 F.3d at 48). **To satisfy the nexus element, the warrant application "must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched.**" *Ribeiro*, 397 F.3d at 49 (citation omitted).

(Emphasis supplied); *United States v. Cordero-Rosario*, 786 F. 3d 64, 69 (1ˢᵗ Cir. 2015) (In conducting our review, moreover, "we give significant deference to the magistrate judge's initial evaluation, reversing only if we see no 'substantial basis' for concluding that probable cause existed." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (quoting  *United States v. Felix*, 182 F.3d [82], 86 (1ˢᵗ Cir. 1999)).

> Prior to executing a search, police officers, with some exceptions, must obtain a search warrant supported by probable cause to believe that (1) a crime has been committed, and (2) that enumerated evidence of the crime will be found at the place to be searched--the so-called nexus element." *United States v. Joubert,* 778 F.3d 247, 251 (1st Cir. 2015) (alterations and internal quotation marks omitted).
>
> When evaluating the nexus between the object and the location of the search, a magistrate judge has to make a practical, common-sense

decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place. **The application must give someone of reasonable caution reason to believe that evidence of a crime will be found at the place to be searched.** The government does not need to show that the belief is necessarily correct or more likely true than false. . . **The reviewing court's duty is simply to ensure that the magistrate had a substantial basis for concluding that probable cause existed.**

*Joubert* at 251-52 (citations, alterations, omissions, and internal quotation marks

omitted) (Emphasis supplied). *United States v. Cordero-Rosario*, 786 F. 3d 64, 69 (1st

Cir. 2015); *United States v. Lyons*, 740 F. 3d 702, 723 (1st Cir. 2014) ("[O]ur inquiry

is whether the magistrate had a 'substantial basis' for concluding that probable cause

existed."

Judge Stearns succinctly discussed the nexus requirement in *United States v.*

*Chalas*, 487 F. Supp. 3d 143, 146 (D. Mass. 2020) where he found insufficient nexus:

> In the law of search and seizure there is a strong preference for the "informed and deliberate determinations of magistrates." *United States v. Lefkowitz*, 285 U.S. 452, 464, 52 S. Ct. 420, 76 L. Ed. 877 (1932), *overruled on other grounds by Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). In recognition of this preference, courts reviewing warrants "will accept evidence of a less 'judicially competent or persuasive character than would have justified an officer in acting on his own without a warrant.'" *Aguilar v. Texas*, 378 U.S. 108, 111, 84 S. Ct. 1509, 12 L. Ed. 2d 723 (1964). A search warrant may issue on a showing of probable cause — something more than a suspicion, but something significantly less than proof beyond a reasonable doubt. *See Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 371, 129 S. Ct. 2633, 174 L. Ed. 2d 354 (2009) (probable cause is a fluid concept taking its substantive content from the particular circumstances - "the best that can be said generally about the required knowledge component of probable cause . . . is that it raise a 'fair probability,' . . . or a 'substantial chance,' . . . of discovering evidence of criminal activity"). With respect to the search itself, there is a two-fold dimension to the showing of probable cause. First, a showing must be made that criminal activity is underfoot, *United States v. Vigeant*, 176 F.3d 565, 569 (1st Cir. 1999), and second, that

"there is a fair probability that contraband or evidence of a crime will be in a particular place" at the time the warrant is executed. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S. Ct. 2317, 76 L. Ed. 2d 527 (1983). In reviewing the validity of a search warrant, a court is confined to the "four corners" of the affidavit - extrinsic evidence is not considered. *Vigeant*, 176 F.3d at 569. When the government has conducted a search or seizure pursuant to a warrant, the defendant has the burden of showing that the warrant is invalid - proof is by a preponderance of the evidence. *United States v. Matlock*, 415 U.S. 164, 177-178 n.14, 94 S. Ct. 988, 39 L. Ed. 2d 242 (1974), citing *Lego v. Twomey*, 404 U.S. 477, 488-489, 92 S. Ct. 619, 30 L. Ed. 2d 618 (1972).

His discussion continued at pp. 148-149:

"[I]t is well established that the temporal proximity or remoteness of events observed has a bearing on the validity of a warrant." *United States v. Dauphinee*, 538 F.2d 1, 5 (1st Cir. 1976); *see also Rosencranz v. United States*, 356 F.2d 310, 315-316 n.3 (1st Cir. 1966). In practical terms, this means that the warrant affidavit must contain information sufficiently fresh to support an inference that the items sought will still be on the targeted premises when the warrant is executed. *Sgro v. United States*, 287 U.S. 206, 210-211, 53 S. Ct. 138, 77 L. Ed. 260 (1932).

Whether or not information is stale depends on the nature of the property to be seized, the nature of the alleged crime, and the nature of the premises to be searched. *Andresen v. State*, 24 Md. App. 128, 331 A.2d 78, 105 (Md. Ct. Spec. App. 1975), *aff'd, sub nom. Andresen v. Maryland*, 427 U.S. 463, 96 S. Ct. 2737, 49 L. Ed. 2d 627 (1976). "The likelihood that the evidence sought is still in place is a function not simply of watch and calendar but of variables that do not punch a clock." *Id.*, 331 A.2d at 106. Certain types of contraband, like child pornography amassed for a pedophile's personal gratification, tend to remain in the hands of their possessors indefinitely. *See United States v. Seiver*, 692 F.3d 774, 777 (7th Cir. 2012) (seven months); *Commonwealth v. Kenney*, 449 Mass. 840, 846, 874 N.E.2d 1089 (2007) ("perhaps a lifetime"). Expensive marijuana cultivation equipment installed at a fixed location might reasonably support an ongoing drug operation for two or more years. *United States v. Schaefer*, 87 F.3d 562, 568 (1st Cir. 1996). A weapons collection is usually carefully curated by its owner. *United States v. Batchelder*, 824 F.2d 563, 564 (7th Cir. 1987) (illegal silencers properly seized on nine-month-old information). Drugs, on the other hand, are a fungible commodity that is typically quickly consumed or sold. *See also Commonwealth v. Fleurant*, 2 Mass. App. Ct. 250, 254-255, 311 N.E.2d 86 (1974).

39

A primary consideration in evaluating whether an affidavit is sufficiently "fresh" is whether it "describes a single transaction or a continuing pattern of criminal conduct." *United States v. Tucker*, 638 F.2d 1292, 1299 (5th Cir. 1981); *United States v. Nocella*, 849 F.2d 33, 39-40 (1st Cir. 1988) ("We agree with the Fifth Circuit that a 'primary consideration in evaluating the staleness issue is whether the affidavit describes a single transaction or a continuing pattern of criminal conduct.'") (quoting *Tucker*, 638 F.2d at 1299).

"[With] a mere isolated violation, it is not unreasonable to believe that probable cause quickly dwindles with the passage of time. On the other hand, if an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Commonwealth v. Vynorius*, 369 Mass. 17, 25, 336 N.E.2d 898 (1975). *See also United States v. Fama*, 758 F.2d 834, 838 (2d Cir. 1985) (latest information thirty-five days old, affidavit detailed a long-term and intensive investigation); *United States v. Moscatiello*, 771 F.2d 589, 597 (1st Cir. 1985) (ongoing narcotics enterprise, year-old information updated by contemporaneous surveillance); *United States v. McElroy*, 587 F.3d 73, 78 (1st Cir. 2009) (three-year-old information regarding a payroll tax avoidance scheme refreshed by defendants' continuing withdrawals of large sums of cash).

On the other hand, a single transaction involving drugs weighs heavily on the staleness scale, particularly where the government relies on a theory of conspiracy to establish ongoing conduct. *See United States v. Izzi*, 613 F.2d 1205, 1210 (1st Cir. 1980) ("A single sale of drugs without more does not establish a conspiracy."); *United States v. DeLutis*, 722 F.2d 902, 905-906 (1st Cir, 1983) (same); *United States v. Wagner*, 989 F.2d 69, 74-75 (2d Cir. 1993) (upholding suppression of search based on six-weeks-old information and single marijuana purchase); *United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006) (an isolated drug sale did not support an inference of "inherently ongoing" conduct).

The Zaremba affidavit did not support the issued warrant, as there was no substantial basis for concluding that probable cause existed. His generalized "boilerplate" observations are not combined with specific observations or facts connecting drug dealing to SUONG's home so as to permit an inference of nexus to 71 Corbett Street, Lowell, MA.

[W]e have rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity. *Khounsavanh,* 113

F.3d at 285. We have further "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." *United States v. Bain,* 874 F.3d 1, 23-24 (1st Cir. 2017)(citation omitted), cert. denied, 138 S. Ct. 1593, 200 L. Ed. 2d 780 (2018). Accordingly, we have found that "generalized observations" of this type should be "combined with specific observations," or facts "connecting the drug dealing to the home" to permit  an inference of nexus to a defendant's residence. [*United States v.]Ribeiro,* 397 F.3d at 50-51[1ˢᵗ Cir. (2005)]; *Bain*, 874 F.3d at 24. Examples of such "specific observations" include evidence that drug distribution "was being organized from [the defendant's] residence," *United States v. Keene*, 341 F.3d 78, 82 (1st Cir. 2003), that the defendant used his home as a communications hub for drug activity, *United States v. Rivera,* 825 F.3d 59, 64-65 (1st Cir. 2016), or that the defendant "move[d] back and forth from his residence in relation to drug transactions," *Ribeiro,* 397 F.3d at 51.

*Roman*, supra, at 52. Like *Roman*, SUONG's case

> ...is not a "case where the affidavit recite[s] facts establishing a clear and substantial connection between the illegal activity and the place searched"; rather, [Zaremba's affidavit] relies upon "speculative inferences piled upon inferences" that [SUONG's] residence would yield relevant evidence. *United States v. Rodrigue,* 560 F.3d 29, 33-34 (1st Cir. 2009). Accordingly, because the...affidavit fails to establish probable cause to search [SUONG's] residence, the fruits of the search of the residence [should] properly [be] suppressed.

*Roman*, *supra*, at 54-55.

### V.     No Police Officer Could Have Harbored an Objectively Reasonable Belief in the Existence of Probable Cause.

This Court should suppress the results of the entry and search of 71 Corbett Street because Zaremba could not have harbored an objectively reasonable belief in the existence of probable cause to search that location.  Suppression is the appropriate remedy where the police officer who obtained a search warrant "could not have harbored an objectively reasonable belief in the existence of probable cause." *United States v. Leon,* 468 U.S. 897, 926 (1984).  Would "a reasonably well-trained officer...  have known that his affidavit failed

to establish probable cause and that (s)he should not have applied for the warrant." *Malley v.*

*Briggs*, 475 U.S. 335, 345 (1986).

> In determining whether the nexus element is satisfied, a magistrate
> has to make "a practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit before him, . . . there is a fair
> probability that contraband or evidence of a crime will be found in a particular
> place." *Illinois v. Gates*, 462 U.S. 213, 238, 76 L. Ed. 2d 527, 103 S. Ct. 2317
> (1983). Put differently, the application must give someone of 'reasonable
> caution' reason to believe that evidence of a crime will be found at the place to
> be searched. *Texas v. Brown*, 460 U.S. 730, 742, (1983)(plurality op.)"

*Ribiero, supra,* at 49.

The above-described omissions of fact in Zaremba's search warrant application would

have caused a reasonably well-trained officer in Zaremba's shoes to have known that the

affidavit failed to establish probable cause. He should not have applied for the warrant, and

the fruits of the search conducted pursuant to that warrant must be suppressed.

## VI. The Court Should Not Conclude that *United States v. Leon*, 468 U.S. 897 (1984) In This Case Bars Suppression

The government has the burden to demonstrate the applicability of the good faith

exception established by *United States v. Leon,* 468 U.S. 897 (1984); See *United States v.*

*Diehl*, 276 F. 3d 32, 42 (1st Cir. 2002), and unless it can meet that burden, the evidence

obtained as a result of an invalid warrant must be suppressed. The Government cannot meet

its burden to demonstrate the applicability of the good faith exception in this case. "Although

weakening the exclusionary rule, the [*Leon*] Court did not eviscerate it." *United States v.*

*Ricciardelli,* 998 F. 2d 8, 15 (1st Cir. 1993). "Good faith is not a magic lamp for police

officers to rub whenever they find themselves in trouble." *United States v. Reilly,* 76 F. 3d

1271, 1280 (2nd Cir. 1996), aff. on rehearing, 91 F. 3d 331 (1996).

42

When an affidavit on its face demonstrates glaring deficiencies in establishing sufficient nexus to the location to be searched, a Court ought not to conclude that, because the magistrate issued the warrant, its execution was relied upon in good faith, a doctrine created by *Leon. Leon, moreover,* states why the good faith doctrine should be inapplicable to transform SUONG's victorious suppression motion into a defeat. The United States Supreme Court said:

> [Searches] pursuant to a warrant will rarely require any deep inquiry into reasonableness," *Illinois* v. *Gates*, 462 U.S., at 267 (WHITE, J., concurring in judgment), for "a warrant issued by a magistrate normally suffices to establish" that a law enforcement officer has "acted in good faith in conducting the search." *United States* v. *Ross*, 456 U.S. 798, 823, n. 32 (1982). Nevertheless, the officer's reliance on the magistrate's probable-cause determination and on the technical sufficiency of the warrant he issues must be objectively reasonable, cf. *Harlow* v. *Fitzgerald*, 457 U.S. 800, 815-819 (1982), and it is clear that in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued.
>
> Suppression therefore remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth. *Franks* v. *Delaware*, 438 U.S. 154 (1978). The exception we recognize today will also not apply in cases where the issuing magistrate wholly abandoned his judicial role in the manner condemned in *Lo-Ji Sales, Inc*. v. *New York*, 442 U.S. 319 (1979); in such circumstances, no reasonably well trained officer should rely on the warran**t. Nor would an officer manifest objective good faith in relying on a warrant based on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Brown* v. *Illinois*, 422 U.S., at 610-611 (POWELL, J., concurring in part); see *Illinois* v. *Gates, supra*, at 263-264 (WHITE, J., concurring in judgment).** Finally, depending on the circumstances of the particular case, a warrant may be so facially deficient -- *i. e.*, in failing to particularize the place to be searched or the things to be seized -- that the executing officers cannot reasonably presume it to be valid. Cf. *Massachusetts* v. *Sheppard, post*, at 988-991.

*United States v. Leon*, 468 U.S. 897, 922- 923 (1984). (Emphasis supplied.)

The determination as to whether the Leon good faith exception applies requires "inquiry into the objectively ascertainable question whether a reasonably well-trained officer would have known that the search was illegal despite the magistrate's authorization." *United States v. Diaz*, 841 F. 2d 1, 5 (1st Cir. 1998) (quoting *Leon*, 468 U.S. at 922, n. 3) Clearly, agent Zaremba knew or should have known that his boilerplate observations, based on his generalized experience in drug cases were no adequate substitution for facts to show a nexus between SUONG's home and a parcel at a post office which never made an appearance at SUONG's home. He should have known that a sole parcel's retrieval at a post office could not fairly and objectively support probable cause to believe that 71 Corbett Street housed drugs, drug paraphernalia, cellphones and drug records. No officer could manifest objective good faith in relying on a warrant based on an affidavit so lacking in probable cause as to render official belief in its existence entirely unreasonable. We must remember that the warrant and affidavit sought permission to search a home NOT occupied by YUT, a known drug dealer, but was instead occupied by persons whom Zaremba had never seen engage in a drug transaction. He had to show that SUONG's home was sufficiently connected to the drug conspiracy so as to permit a reasonable belief that, at the time of the search, contraband or evidence would be found at SUONG's home. This he could not do.

*Leon* made clear that an officer would not "manifest objective good faith in relying on a warrant based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.'" *Leon*, 468 U.S. at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-11 (1975)); see also *United States v. Capozzi*, 91 F. Supp. 2d 423, 434 (2000) (Saris, D.J. finding warrant application lacked probable cause to search hotel room but also held good faith exception applied, as the "affidavit in this case was more than a

44

"bare bones" recitation of conclusory allegations); see also *Leon,* 468 U.S. at 923 at n.24 (distinguishing cases where an officer obtains a warrant on the basis of a "bare bones" affidavit). Here, the defendant posits, based upon the arguments *supra,* that Zaremba's affidavit, rich in facts as it pertains to YUT, is impoverished as it pertains to SUONG and the Target Premises, his home at 71 Corbett Street, Lowell, MA and as such renders it a "bare-bones affidavit". It is government which must prove, however, that it is not.

*United States v. Weaver,* 99 F.3d 1372, 1378 (6th Cir. 1996) defines a "bare bones" affidavit as "An affidavit that states suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity reliability, and basis of knowledge is a 'bare-bones' affidavit". The First Circuit has relied upon *Weaver* in *United States v. Capozzi*, 347 F.3d 327, 334 (1st Cir. 2003); and in *United States v. Vigeant,* 176 F.3d 565, 571 (1st Cir. 1999) for the same proposition:

> [S]ufficient information must be presented to the magistrate to allow that
> official to determine probable cause; his action cannot be a mere
> ratification of the bare conclusions of others."); *Aguilar v. Texas*, 378 U.S.
> 108, 113-14 (1964) (affidavit that provides affiant's conclusions without
> also providing some underlying factual circumstances is equivalent to the
> "bare bones" affidavits rejected in, *inter alia. Nathanson v. United States*,
> 290 U.S. 41 (1933).

As *Chalas* in finding that the warrant in that case could not be rescued by *Leon* noted at p. 150:

> "Nothing in our opinion suggests, for example, that an officer could obtain
> a warrant on the basis of a 'bare bones' affidavit and then rely on
> colleagues who are ignorant of the circumstances under which the warrant
> was obtained to conduct the search." *[Leon]* at n.24. *See also Malley v.
> Briggs*, 475 U.S. 335, 106 S. Ct. 1092, 89 L. Ed. 2d 271 (1986) (officer
> who obtained an arrest warrant on facts that no objectively reasonable
> officer could have thought to have constituted probable cause could be

held personally liable for civil damages); *United States v. Fuccillo*, 808 F.2d 173, 178 (1st Cir. 1987) (good faith could not save a warrant the supporting affidavit of which recklessly omitted easily obtainable and critical information); *United States v. Hove*, 848 F.2d 137, 139-140 (9th Cir. 1988) (good faith could not save a warrant where the supporting affidavit lacked any evidence connecting the defendant to the premises to be searched).

When reviewing the Zaremba affidavit as a whole, but in the context of 71 Central Street, what is represented is one instance of alleged narcotics activity, a retrieval of a parcel at a post office never shown to be connected to 71 Central Street. Throughout the 2-year investigation, SUONG on the one day of November 16, 2020 is never heard on the cellphone and his text messages or emails are unread. The conclusions that Special Agent Zaremba drew from this one series of communications on the one day that 71 Central Street was a "stash" house or used to store narcotic information or paraphernalia by SUONG, does not speak in terms of probabilities or even in terms of realistic, factually-grounded possibilities; Zaremba constantly uses the term "likely," even though Zaremba didn't really have the foggiest idea one way or the other, except that he knew of a parcel's attempted retrieval by YUT at the post office.

As stated above, one instance of anything is insufficient to amount to the pattern required to search residences at some later date. On balance, the Zaremba affidavit was a bare bones affidavit, and any reasonable officer would know it. See *United States v. Cordero-Rosario*, 786 F.3d 64 (1st Cir. 2015) (no nexus presented in affidavit to search for the crime under investigation, and since no facts were presented in the affidavit to support the issuance, other than conclusory assertions, the police cannot be said to be

acting reasonably). Here, SUONG contends that Special Agent Zaremba was not acting reasonably in his reliance upon the one instance of alleged narcotics' activity at a post office to support a basis to search SUONG'S residence, and based upon his unreasonable conduct, deterrence is called for as a sanction.

Deterrence is required here because no officer of reasonable competence would have requested the warrant, because any reasonable officer would know that one instance of narcotics' activity at one's residence does not amount to probable cause to search that residence six months later.

In *Chalas*, 478 F. Supp. 3d at 151-152, on substantially similar facts to the case at bar set forth above, the Court granted the motion to suppress and found inapplicable *Leon*'s good faith exception.

> Here, the evidence disclosed in the affidavit that drugs might be found in Chalas's apartment consisted of Agent Golia's speculation that Ramirez and Chalas "possibly share or use the same drug stash house," and the wiretap evidence establishing that the two men met to process drugs supplied by Ramirez at Chalas's apartment on the morning of July 7, 2017. Agent Golia's hunch that Chalas's apartment was a possible stash house is insufficient to establish probable cause as a matter of law, *see Spinelli v. United States, 393 U.S. 410, 418, 89 S. Ct. 584, 21 L. Ed. 2d 637 (1969)*, while evidence of Chalas's one-off collaboration with Ramirez in early July is insufficient as a matter of law to support the inference that drugs would be found in late August in his home. The government cites no case, nor has the court found one, where absent a showing of protracted conduct or entrenched reputation, a court has sanctioned an interval of this magnitude between evidence of drugs in a person's home and probable cause to believe they would still be there six weeks later. Consequently, the motion to suppress the evidence seized on August 22, 2017, from Chalas's apartment will be allowed.
>
> *Good Faith Exception*
>
> Whether the good faith exception should apply (to my mind) represents a much closer question. On this issue, the burden shifts to the government to show that application of the exclusionary rule would serve no deterrent purpose. *See United States v. Diehl*, 276 F.3d 32, 42 (1st Cir. 2002), citing *Leon*, 468 U.S. at 897. The *Leon* Court cited four specific instances in which the good faith exception does not apply of which the third is relevant here: whether the affidavit supporting the warrant is "'so lacking in indicia

of probable cause as to render official belief in its existence entirely unreasonable.'" *Id.* at 923 (quoting *Brown v. Illinois*, 422 U.S. 590, 610-611, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975)(Powell, J., concurring in part)). Such affidavits are often labeled "bare bones," that is, consisting of mostly suspicions or conclusions, without making "some connection" between illegal activity and the place to be searched. *United States v. Christian*, 925 F.3d 305, 312-313 (6th Cir. 2019) (en banc); *see also Vigeant*, 176 F.3d at 571-572.

The case most in point (and most persuasive) on the issue of good faith is *United States v. Ward*, 967 F.3d 550, 2020 U.S. App. LEXIS 23607, 2020 WL 4282161 (6th Cir. July 27, 2020). In *Ward*, the defendant was charged with drug trafficking and firearms possession based on evidence seized from his home. The affidavit supporting the search warrant for Ward's home recited undated text messages implicating Ward in a fatal sale of drugs seven months before the search took place, a trash pull the week before the search that uncovered some loose marijuana, cigar wrappers, and a plastic bag containing an unidentified residue of what police believed might be an illicit substance, and the fact that Ward had been previously charged with drug and weapons offenses. 2020 U.S. App. LEXIS 23607, [WL] at *3. Citing *Hython, supra*, as the case "most similar," the Sixth Circuit noted that it did not apply the good faith exception in that case "because the affidavit did not indicate a timeframe for the events, and, more importantly here, the isolated controlled buy [in *Hython*] did not allow an inference that further drug-related evidence would be found in defendant's home, as the sale of drugs [was] not 'inherently ongoing.'" 2020 U.S. App. LEXIS 23607, [WL] at *5.

In the case at hand, no reasonable officer could have believed that probable cause had been shown that drugs would be found in Chalas's home six weeks after a single instance of mixing drugs and - this is important - that had been brought to his apartment for that purpose by Ramirez (and not supplied by Chalas). Finding that the government has failed to carry its burden of showing good faith is not to say that the court has implicitly found bad faith on the part of Agent Golia or the officers who assisted in executing the warrant. Chalas, as indicated, was a small piece of a much larger puzzle and it is understandable that, given the massive amount of evidence that had been amassed against Ramirez (whose two stash houses on Everett Avenue and Adams Street in Dorchester were the principal targets of the warrant), a more exacting examination of the lack of evidence suggesting that drugs would be found in his residence was not conducted.

Deterrence is required here, because frankly, Special Agent Zaremba should know better. "[I]f no officer of reasonable competence would have requested the warrant, i.e., his request is outside the range of professional competence expected of an officer, then the fact that the magistrate approved the application is of no help to him. The applying officer cannot excuse his own default by pointing to the magistrate." *United States v. Vigeant,* 176 F.3d 565, 572-73 (1st Cir. 1999) quoting *Malley v. Briggs*, 475

48

U.S. 335 346 n.9 (1985). Good faith exception does not apply.

Since at least 1999, this Circuit has required the affiant to know that a continuing pattern of criminal conduct or ongoing conspiracy is what is required to serve as the substantial basis of evidence needed to be able to justify the nexus between a residence and fruits of a crime, and that one instance of criminal conduct will not amount to an ongoing conspiracy or pattern of criminal conduct. In fact, not only should the affiant know this, but it appears that that the agent does, as Zaremba cites within his affidavit *United States v. Feliz*, 182 F. 3d 82, 87 (1st Cir. 1999) (citing *United States v. Greany*, 929 F. 2d 535, 525 (9th Cir. 1991) (two-year-old information relating to marijuana operation not stale) which supports the same proposition. See also *Rivera v. United States,* 928 F. 2d 592,602 (2d. Cir. 1991). Special Agent Zaremba failed to consider that binding precedent in this circuit does not allow isolated instances of criminal activity to amount to a conspiracy or a nexus to search one's residence at some protracted time in the future. "[M]embership in a drug conspiracy by itself does not – and cannot – establish automatic probable cause for a search of [a] person's home for drugs." *Chalas*, 478 F. Supp. 3d at 150. As such, it was objectively unreasonable for Zaremba to rely on the magistrate's decision to issue the warrant in this case. "Responsible law enforcement officers [must] take care to learn what is required of them, under Fourth Amendment precedent and [must] conform their conduct to these rules". *United States v. Davis,* 131 S. Ct. 2419, 2429 (2011).

This Court, moreover, has discretion to exclude the evidence and permit suppression, even if he found that he could apply *Leon*'s good faith ruling.

> Nor are we persuaded that application of a good-faith exception to searches conducted pursuant to warrants will preclude review of the constitutionality of the search or seizure, deny needed guidance from the courts, or freeze Fourth Amendment law in its present state.  There is no need for courts to adopt the inflexible practice of always deciding whether the officers' conduct manifested objective good faith before turning to the question whether the Fourth Amendment has been violated. Defendants seeking suppression of the fruits of allegedly unconstitutional searches or seizures undoubtedly raise live controversies which Art. III empowers federal courts to adjudicate. As cases addressing questions of good-faith immunity under 42 U. S. C. § 1983, compare *O'Connor* v. *Donaldson*, 422 U.S. 563 (1975), with *Procunier* v. *Navarette*, 434 U.S. 555, 566, n. 14 (1978), and cases involving the harmless-error doctrine, compare *Milton* v. *Wainwright*, 407 U.S. 371, 372 (1972), with *Coleman* v. *Alabama*, 399 U.S. 1 (1970), make clear, courts have considerable discretion in conforming their decision making processes to the exigencies of particular cases.

> If the resolution of a particular Fourth Amendment question is necessary to guide future action by law enforcement officers and magistrates, nothing will prevent reviewing courts from deciding that question before turning to the good-faith issue.  Indeed, it frequently will be difficult to determine whether the officers acted reasonably without resolving the Fourth Amendment issue. Even if the Fourth Amendment question is not one of broad import, reviewing courts could decide in particular cases that magistrates under their supervision need to be informed of their errors and so evaluate the officers' good faith only after finding a violation. In other circumstances, those courts could reject suppression motions posing no important Fourth Amendment questions by turning immediately to a consideration of the officers' good faith. We have no reason to believe that our Fourth Amendment jurisprudence would suffer by allowing reviewing courts to exercise an informed discretion in making this choice.

*Leon, supra* at 924-925. The United States Supreme Court has explicitly permitted this Court to exercise discretion so as to grant suppression, even if this Court has the power to impose the *Leon* ruling, when suppression remains the appropriate remedy for the grievous wrongs caused by a glaringly insufficient affidavit failing to establish both probable cause and nexus and relying upon unsubstantiated-by-facts generalized observations.

SUONG suggests, moreover, that *Leon's* good faith requirement is a judicial appendage undermining the Fourth Amendment and should be reversed. Its history demonstrates that it has the profoundly unfortunate effect of protecting police misdeeds in warrant applications and affidavits and immunizes them from correct rebuke and/or discipline; it causes police to write with impunity baseless assertions. While Zaremba arguably eschews misstatements of fact and thus SUONG does not seek a *Franks* hearing, Zaremba engages in wide speculation unfounded by facts to explain why, because activity concerning a post office parcel involved SUONG, SUONG's home should be searched as if it was a thriving, ongoing drug location, although Zaremba marshals no facts to support this. Such a misleading warrant and deficient affidavit is, in part, caused by the several court cases that utilize *Leon* to emasculate Fourth Amendment rights of aggrieved defendants. *Leon* should be reexamined by the United States Supreme Court to see its pernicious effects on Fourth Amendment jurisprudence and it should be reversed.

Application of a *Leon* defense to suppression in the criminal setting, and application of the "qualified immunity" defense to a lawsuit under 42 U.S.C. § 1983 for searching pursuant to a warrant lacking in probable cause, *see Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012), means that many whose Fourth Amendment rights have been violated ultimately have **no remedy**, in violation of one of this country's most important precedents. *See Marbury v. Madison*, 5 U.S. 137, 163 (1803) ("[W]here there is a legal right, there is also a legal remedy..., whenever that right is invaded"). Assuming *arguendo* that the warrant lacked probable cause but that *Leon* nonetheless applies, then *Leon* must be overruled as incompatible with *Marbury*.

## CONCLUSION

Therefore, for all the foregoing reasons, Defendant BARNDOL SUONG respectfully requests that this Court GRANT the Defendant BARNDOL SUONG'S Motion to Suppress and SUPPRESS any and all fruits of the June 9-10, 2021 search of his 71 Corbett Street home.  Accordingly, the search warrant for the search of this residence, and all derivative evidence must be suppressed as fruit of the poisonous tree. United States v. Wong Sun, 371 U.S. 471,488 (1963).

<div style="margin-left:40%">

Defendant
By His Attorney,
BARNDOL SUONG

/s/James B.Krasnoo
James B. Krasnoo (Bar No. 279300)
jkrasnoo@kkf-attorneys.com
Krasnoo, Klehm and Falkner, LLP
28 Andover Street, Suite 240
Andover, MA  01810
(978) 475-9955 (telephone)
(978) 474-9005 (facsimile)

</div>

Dated:  December 13, 2021

## CERTIFICATE OF SERVICE

I hereby certify that I served a true copy of the within document upon the attorney of record for each other party via the Court's ecf system on December 13, 2021.

<div style="margin-left:40%">

/s/ James B. Krasnoo
James B. Krasnoo

</div>