UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CRIMINAL NO. 21-10243-GAO

UNITED STATES OF AMERICA,

v.

BARNDOL SUONG,
Defendant.

OPINION AND ORDER
September 30, 2022

O'TOOLE, D.J.

The defendant, Barndol Suong, stands indicted on a single charge of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g)(1). The charge arises out of law enforcement's discovery of a firearm and ammunition during the execution of a search warrant at the defendant's residence. Because the defendant has a criminal record that includes at least one prior felony conviction, his knowing possession of a firearm and ammunition would be unlawful. The defendant now moves to suppress the seized evidence and all fruits derived from the search on the basis that the warrant application failed to establish probable cause to believe that evidence of criminal activity was likely to be found at his residence at the time the warrant was executed.

**I.    Background**

    A.    Warrant Application and Affidavit

On June 9, 2021, Federal Bureau of Investigations Special Agent Matthew R. Zaremba submitted an affidavit in support of an application for a warrant to search the defendant's residence at 71 Corbett Street in Lowell, Massachusetts, attesting that based on an investigation that began

in August 2018, there was probable cause to believe that the residence contained evidence of a conspiracy with others, including Sarath Yut and Savoeurn Choun, to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 846 and a conspiracy to launder drug proceeds in violation of 18 U.S.C. § 1956(h). The warrant application did not specifically assert probable cause to believe a firearm would be found in the intended search.

According to his affidavit, Zaremba has been a special agent with the Federal Bureau of Investigation since 2006. At the time of the warrant application, he was assigned to work on counterterrorism and criminal matters. He received specialized training regarding the activities of narcotics traffickers, including the methods used to package, store, and distribute narcotics, as well as the methods used by narcotics traffickers to conceal and launder the proceeds of narcotics trafficking activities.

In August 2018, the FBI, Lowell Resident Agency, and the Lowell Police Department began investigating the One Family Clique ("OFC"), an alliance of local gangs based in Lowell. OFC is an association of primarily Asian gangs founded by Sarath Yut. The OFC engages in drug and firearm trafficking, robbery, and acts of violence against rival gangs.

Specifically, the affidavit asserted that Yut had sources of supply for cocaine and methamphetamine in California and regularly utilized the United States Postal Service ("USPS") to facilitate the transportation of drugs and payments for them. According to the affidavit, between January 2020 and August 2020, Yut mailed at least twelve parcels to the address "1202 Camino del mar, Del Mar, CA 92014" and thirty-five parcels to other locations. (Aff. of James B. Krasnoo, Esq. in Supp. of Def. Barndol Suong's Mot. to Suppress, Ex. A at ¶ 22 (dkt. no. 42-1).)

Agents believed the mailings included bulk cash for the purchase of illegal narcotics. The parcels shared certain characteristics consistent with packages that experience had shown

contained illegal controlled substances or drug proceeds, such as being addressed to a known narcotic source city, handwritten address information, cash payments for shipping costs, and addresses from or to an individual or entity that did not actually exist at the addresses used on the shipping labels.

The affidavit described a controlled buy and subsequent execution of a sneak and peek warrant on a parcel as an example of Yut's utilization of the USPS to transport payments for illicit narcotics and/or proceeds. On February 24, 2020, agents engaged in a controlled purchase of cocaine from an individual identified as Peouveasnah Pin. The next day, Pin entered a residence carrying a white envelope resembling the one given to him by the undercover agent during the controlled buy about half an hour after Yut was observed entering the same building carrying a brown package. On March 2, 2020, Yut mailed a package under the alias "Christian Seng" to "Justin Lane, 1202 Camino del mar, suite b, Del Mar, CA 92014." (Id. at ¶ 20.) The United States Postal Inspection Services ("USPIS") intercepted the package, and after securing a search warrant, opened the package and discovered $54,000 in United States currency with serial numbers matching the official agency funds the undercover agent utilized during the controlled purchase from Pin on February 24th.

The affidavit next described the travel of a particular mailed parcel that was suspected to contain drug proceeds that occurred about eight months later. On November 3, 2020, Yut left a "known drug processing and distribution location" with two large boxes. (Id. at ¶ 23 n.11.) That same day, Yut mailed a brown box, Parcel 53523 (based upon the long identification number assigned by USPS), with a mailing label identifying the sender as "C. PYNE, 58 Corbett St., Lowell, MA 01851" and the recipient as "Justin LANE, 1202 Camino del Mar, Del Mar, CA

92014." (Id. at ¶ 24.) Although those were actual addresses, neither was associated with actual persons named Pyne or Lane.

The USPS did not deliver Parcel 53523 because the designated location was vacant. USPIS San Diego secured the parcel, pending anticipated inquiries by the intended recipient. Multiple IP addresses thereafter tracked Parcel 53523. A telephone number associated with Suong, 978-995-8091 ("Phone 8091"), tracked Parcel 53523 online twice on November 9, 2020. That same day, a USPS.com account was activated using a telephone number associated with Yut, 978-996-3292 ("Phone 3292"), to track Parcel 53523. Special Agent Zaremba stated in the affidavit that he "believe[d] that SUONG was interested on YUT's behalf with what happened to the package and was likely attempting to aid YUT in its retrieval." (Id. at ¶ 39.)

The USPS did not receive any inquiries about the parcel and therefore USPIS San Diego returned it to Massachusetts on November 12. USPS tried to deliver the parcel to 58 Corbett Street on November 16, but the woman who answered the door professed to know nothing about the parcel, and accordingly the carrier returned it to the USPS Billerica Destination Delivery Unit ("DDU").

That same day, a person identifying himself as Sarath Yut called from Phone 3292 to inquire about Parcel 53523. He said that his friend, who lives at 71 Corbett Street, had mailed Parcel 53523 but mistakenly listed the return address as 58 Corbett Street.[1] He reported that C. Pyne was the friend who mailed the package. Special Agent Zaremba understood the story to be false because video footage showed Yut mailing the package. Later that day, Yut called again and

---

[1] The defendant's listed address with the Registry of Motor Vehicles and Lowell Police Department Records is 71 Corbett Street. The registered deed lists Vinn Suong and Nam Va as the owners. Vinn Suong is the defendant's father.

4

clarified that the listed sender name of C. Pyne was actually a company acronym. The caller asked for Parcel 53523 to be transferred to the Lowell Post Office.

On November 18, Yut and an unidentified woman arrived at the Billerica DDU to inquire about Parcel 53523. They were advised that it had been sent to the Lowell Post Office as requested. Yut said he would retrieve it the next day.

On November 19, two persons arrived at the Lowell Post Office and inquired about Parcel 53523. They were identified by documentation as Yut and Savoeurn Choun, who lived at 77 Corbett Street, Lowell, Massachusetts.[2] Yut repeated the same story regarding his friend putting the incorrect return address on the parcel, but this time stated that the listed sender name was a member of his "car crew." (Id. at ¶ 35.) Special Agent Zaremba again understood that the various inconsistent assertions were "all false." (Id.) The next day, agents confirmed that Yut and Choun had actually picked up the parcel.

The parcel apparently was never opened by the USPIS and the contents were not confirmed. Special Agent Zaremba stated that he believed that the parcel "likely contained drug proceeds, because it fit the pattern of using the mail and using false names; because YUT, who was listed as neither sender nor recipient, (and others) tracked it carefully, . . . ; and because YUT and others used a false story in their efforts to retrieve the package, which they likely would not have done with a non-contraband package." (Id. at ¶ 36.)

---

[2] Choun is the defendant's significant other and mother of his children. Lowell Police Department had had multiple interactions with both the defendant and Choun at 71 Corbett Street. Although Choun lists 77 Corbett Street on her driver's license, she lives with the defendant and their children at 71 Corbett Street. The owner of 77 Corbett Street at some point was Sreyleak Suong, the defendant's sister.

Zaremba's affidavit also described the date, time, and length of various communications between Phone 8091 (Suong's phone) and Phone 3292 (Yut's phone). It stated that between November 1, 2020, and May 28, 2021, Phone 8091 and Phone 3292 had shared 245 contacts, including 207 text messages and thirty-eight telephone calls. They exchanged nine text messages on November 5, the day before Parcel 53523 was to be delivered to the vacant address in California, but was not. On November 6, the two phones exchanged one thirty-second phone call. On November 7, they exchanged thirteen text messages and two phone calls between two and four minutes long. On November 8, they exchanged eight text messages. On November 10, they exchanged one text message and a phone call that lasted twenty-six seconds. On November 11, they exchanged one phone call lasting a little over two minutes. On November 12, they exchanged eight text messages. On November 16, the day Yut called the Billerica DDU to inquire about Parcel 53523 and reported that the sender actually lived at 71 Corbett Street, there were a series of text exchanges and phone calls between the two numbers. They occurred before, in between, and after the telephone calls Yut made to the Billerica DDU. On November 18, Yut called 978-995-2736, another number associated with Suong, for a minute-long conversation.[3] Special Agent Zaremba stated in his affidavit that he believed that Yut likely contacted the defendant because he resided at the "return address" Yut had provided to USPS. (Id. at ¶ 41.)

Other than the events of November 2020, the affidavit included an additional reference to the defendant. The defendant received a total of $5,320 in his Cash App account from Yut's account between October 2018 and January 2020. The note "dead broke recordz" was included on the transactions. (Id. at ¶ 46.) The affidavit stated that Special Agent Zaremba believed Yut used

---

[3] The affidavit does not contain any information about the contents of any of the text messages or telephone conversations, nor does it detail the specific number of daily text messages and phone calls for periods of time other than the November 2020 activity.

the term as a label to conceal payments for narcotics and other illegal activities, but referred the reader to a different affidavit, not offered in support of the warrant at issue here, for "greater detail." (Id.)

Special Agent Zaremba stated that he believed 71 Corbett Street would likely contain evidence that the defendant used and possessed Phone 8091, such as telephone bills or other records; evidence of the defendant's use of the Cash App account, whether digital or paper form; evidence of the defendant's possession and control of 71 Corbett Street; and evidence regarding other likely on-going drug-trafficking activities.

On June 9, 2021, he applied for the warrant to search the 71 Corbett Street premises for evidence related to the distribution of controlled substances and conspiracy to possess with intent to distribute controlled substances in violation of 21 U.S.C. § 841(a)(1) and 846 and conspiracy to launder drug proceeds in violation of 18 U.S.C. § 1956(a)(1)(B). A magistrate judge authorized the requested warrant.

      B.      Execution of the Search Warrant

According to the Affidavit of Special Agent Matthew R. Zaremba in support of an application to issue a criminal complaint (dkt. no. 42-5), an FBI team executed the search warrant on June 10, 2021. Agents entered a room they believed to be the defendant's bedroom. In the top drawer of a dresser, agents located an unloaded Taurus revolver and five rounds of ammunition. In the bottom left drawer of the same dresser, agents located fifteen additional arounds of ammunition.

Because the defendant has a criminal record that includes at least one prior felony conviction, making unlawful the possession of the seized items, the defendant was arrested and indicted.

**II.     Discussion**

    A.     Probable Cause Determination

The defendant challenges the probable cause determination made by the magistrate judge, claiming generally that the facts purporting to support a probable cause showing were stale when presented and accordingly failed to establish that evidence material to the defendant's alleged drug trafficking or laundering would be found at the targeted premises at the time the warrant would be executed.

An affidavit submitted in support of a search warrant "must contain timely information or else it will fail." United States v. Schaefer, 87 F.3d 562, 568 (1st Cir. 1996). For example, information is stale if "it established probable cause at some point in the past but does not support probable cause at the time of the warrant's issuance." United States v. McLellan, 792 F.3d 200, 210 (1st Cir. 2015). Staleness, however, cannot be assessed "by counting the number of days between the events described in the affidavit and a warrant's issuance, as a merchant would beads on an abacus." United States v. Tiem Trinh, 665 F.3d 1, 13 (1st Cir. 2011). Rather, the evaluation requires consideration of "various factors, including 'the nature of the information, the nature and characteristics of the suspected criminal activity, and the likely endurance of the information.'" Id. at 13–14 (quoting United States v. Morales-Aldahondo, 524 F.3d 115, 119 (1st Cir. 2008)). Information involving a "drug-trafficking enterprise, in which large-scale transactions may take weeks or months to mature, normally will have a longer shelf life." United States v. Encarnacion, 26 F.4th 490, 498 (1st Cir. 2022). "This shelf life sometimes may be extended when the application describes an ongoing pattern of conduct in the drug-trafficking arena, United States v. Nocella, 849 F.2d 33, 40 (1st Cir. 1988), because the probable cause determination will not hinge on discrete

pieces of standalone evidence but, rather, on the totality of the circumstances." Encarnacion, 26 F.4th at 498.

For instance, in United States v. Nocella, the First Circuit upheld the district court's determination that information regarding the defendant's role in narcotics trafficking was not stale where the affidavit provided information about three controlled drug purchases made approximately five months before the warrant application, threats the defendant made to an informant, and additional sales by an undercover officer from a middleman shortly before the issuance of search warrant. 849 F.2d at 39–40. Similarly, in United States v. Tiem Trinh, the First Circuit concluded that the district court did not commit error when it decided a warrant application was not stale even though there was a two-month lapse between observations and the warrant's issuance. 665 F.3d at 13–14. It found persuasive information in the warrant affidavit about surveillance and a cooperating source who indicated that non-transient equipment related to a marijuana growing operation would be found at the residence purchased by the defendant and intercepted telephone calls "bridged the gap" between older information and present activities. Id. at 14–15. On the other hand, in United States v. Chalas, the district court found that a six-week interval between a single episode of identified drug-related activity at the defendant's apartment in early July and a subsequent warrant application to search that apartment in late August was too speculative to support a valid probable cause. 478 F. Supp. 3d 143, 151 (D. Mass. 2020). The court noted that the agent's speculation that drugs would be found in the defendant's apartment because there had been drugs there on one prior occasion "insufficient as a matter of law to support the inference that drugs would be found in late August in his home." Id. As the court observed, "membership in a drug conspiracy by itself does not—and cannot—establish automatic probable cause for a search of [a] person's home for drugs." Id. at 150.

In this case, the affidavit failed to show that contraband was likely to be found at 71 Corbett Street in June 2021 simply because the defendant appeared to have been helping Yut collect drug proceeds the previous November. No facts are asserted to support a conclusion—rather than speculation—that Suong and Yut might be cooperating in June because they had collaborated the previous November.

There is an additional weakness in the claim that the collection efforts of the previous November supported a conclusion that evidence of drug dealing would be found at Suong's home in June 2021. After all, the point of Suong's cooperation with Yut was to help Yut get *his* money. There was nothing about the November episode that indicated Suong would have either proceeds or actual illegal drugs at his own home the following June.

While it is true that deciding whether probable cause to search exists does not involve simply counting the days between the receipt of the relied-on information and the subsequent application for the warrant, the length of time is relevant to the determination whether probable cause still exists at the time of the application for the warrant. In this case, the passage of time without any further evidence of cooperative suspicious behavior by Suong between the retrieval of Parcel 53523 in November 2020 and the warrant application is significant. See, e.g., Chalas, 478 F. Supp. 3d at 151 ("The government cites no case, nor has the court found one, where absent a showing of protracted conduct or entrenched reputation, a court has sanctioned an interval of this magnitude between evidence of drugs in a person's home and probable cause to believe they would still be there six weeks later."). There is no information presented in the affidavit that bridges that gap. It is true that drug trafficking may generally be a crime that can persist over extended periods of time, but the application here does not include any information near in time to the warrant's issuance to support an inference, rather than a mere suspicion, that a search of the defendant's

residence would yield evidence of the suspected crime. For instance, no evidence was proffered that the nature of the premises to be searched was itself suggestive of illegal activity at the premises, as there was, for example, in Tiem Trinh. See 665 F.3d at 15 (presence of machinery commonly involved in marijuana cultivation). There was nothing in the affidavit to suggest a link between Suong's residence and his purported efforts to assist Yut by picking up a package for him.

Although police need not seek a warrant as soon as they have the information necessary to demonstrate probable cause, the affidavit at issue must contain sufficient current information to conclude that evidence of the purported criminal activity will be at the location when the warrant is executed. Here, the information relied on—over six months old at the time the warrant was sought—focused on the defendant's cooperation with Yut and not on his residence. The affidavit lacked any additional fresh information to conclude that evidence of the listed crimes would be discovered at the residence at the time the warrant was sought. The staleness of the information presented in the affidavit undermines the probable cause determination made by the magistrate judge.

    B.    Good Faith Exception

The government argues in the alternative that, even if probable cause for the warrant was objectively lacking, the good faith exception to the exclusionary rule should apply. See United States v. Leon, 468 U.S. 897, 923 (1984).

To deter Fourth Amendment violations, the common remedy for seizures made without probable cause is to exclude the wrongfully seized evidence. However, under Leon, if an objectively reasonable law enforcement officer has relied in good faith on a warrant later found to have been wrongly issued, the evidence discovered generally is not excluded because suppression would not serve a deterrent purpose. Id. Nonetheless, suppression continues to be appropriate

where the affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Id. (quoting Brown v. Illinois, 422 U.S. 590, 610–11 (1975) (Powell, J., concurring in part)). "[T]he relevant question [is] 'whether a reasonably well-trained officer in [Special Agent Zaremba's] position would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" United States v. Vigeant, 176 F.3d 565, 572 (1st Cir. 1999) (quotation omitted). The government bears the burden of showing that the good faith exception applies. United States v. Diehl, 276 F.3d 32, 42 (1st Cir. 2002).

In this case, no reasonable officer could have believed that the affidavit supported probable cause that evidence of money laundering or drug trafficking would have been found at the subject residence over six months after Suong's apparent cooperation with Yut to receive delivery of a package likely containing cash to ultimately be delivered to Yut after it failed to reach the intended recipient in California. The obvious purpose of Yut's machination in this instance was to have the returned drug proceeds be recovered by someone using an address not identified to Yut. Surely experienced drug crime investigators would not be surprised by such a false flag operation. It might be one thing for an apparent drug dealer like Yut to stash his drugs with someone else so as to avoid being found in possession of the contraband. It would be quite another matter for the dealer to entrust tens of thousands of dollars in cash to someone else for an extended period of time, such as, for example, six to seven months. All that appears from the affidavit is that the defendant at most "was a small piece of a much larger puzzle," see Chalas, 478 F. Supp. 3d at 152, and Special Agent Zaremba should have known his affidavit was barebones as to the significance of the defendant's puzzle piece.

Consequently, the warrant application is so lacking in sufficient indicia of probable cause as to the target premises at the time the warrant was sought that any official belief in its existence was unreasonable. Therefore, the government's attempted reliance on the good faith exception fails.

### III.   Conclusion

For the foregoing reasons, the defendant's Motion the Suppress (dkt. no. 40) is GRANTED. It is SO ORDERED.

/s/ George A. O'Toole, Jr.
United States District Judge